IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 28, 2011 Session

## STATE OF TENNESSEE V. JOSEPH NATHANIEL NANCE

**Appeal from the Circuit Court for Campbell County**
**No. CM13760    E. Shayne Sexton, Judge**

---

**No. E2010-01221-CCA-R3-CD - Filed May 16, 2012**

---

The Defendant, Joseph Nathaniel Nance, was convicted of six counts of rape of a child and one count of aggravated sexual battery. Following a sentencing hearing, the trial court imposed an 18-year sentence for each rape of a child conviction and a 10-year sentence for the aggravated sexual battery conviction. The court ordered consecutive service of several of the convictions, resulting in a total effective sentence of 64 years. On appeal, the Defendant raises the following issues for our review: (1) whether the trial court erred by excluding sexual entries from the victim's MySpace page as irrelevant and inadmissible; (2) whether the trial court erred by allowing evidence of the victim's prior sexual history to be used only for impeachment purposes; (3) whether the evidence was sufficient to support the Defendant's convictions; and (4) whether the Defendant's effective 64-year sentence was excessive.[1] Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and CAMILLE R. MCMULLEN, J., joined.

D. Brent Gray (on appeal) and Robert W. Scott (at trial), Jacksboro, Tennessee, for the appellant, Joseph Nathaniel Nance.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; William Paul Phillips, District Attorney General; Scarlett W. Ellis, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
FACTUAL BACKGROUND

---

[1] For the purpose of clarity, we have reordered the issues as stated by the Defendant in his brief.

On July 7, 2008, the Defendant was charged with six counts of rape of a child and one count of aggravated sexual battery against the victim, M.L.[2]  A three-day trial was held August 18 through 20, 2009.  At trial, the State claimed that on or about November 1, 2007, through May 2008, the Defendant sexually penetrated M.L. on six different occasions and, on one occasion, engaged in unlawful sexual contact with the victim.

M.L. provided that her birthdate was April 20, 1997, thus, making her 12 years old at the time of trial.  She testified that in November 2007, she moved into a mobile home in Campbell County with her mother, her sister, and the Defendant, who was one of her mother's "ex-fiances."  At that time, she was in the fifth grade.  Because the victim's mother was employed at McDonald's in Lake City working fluxuating shifts, the Defendant, who was a truck driver, was often alone with the victim and her sister.  According to the victim, the rapes took place in the Defendant and her mother's bedroom, her bedroom, and the living room of the home.  During many of the episodes, the Defendant advised the victim of "rule number one"—that he would kill her if she told anyone about the rapes.

The victim testified that on one occasion, the Defendant called her into his bedroom to help clean and simultaneously sent her sister outside to rake leaves.  According to the victim, there were "no leaves in the yard because it was like spring or right before fall."  The victim testified that once inside the bedroom, the Defendant took her clothes off and pushed her down on the bed.  He then spread her legs and put his penis all the way inside her.  The victim told the Defendant that she "didn't want to," but the Defendant said, "Well, too bad[.]"

According to the victim, another rape occurred on an old, pink sofa in her bedroom when her mother was at work and her sister was away from the house.  The Defendant pushed her down onto the sofa and removed her pants.  The Defendant "started to put his penis inside" her.  She told him no and tried to push him off, but he slapped her in the face with "[t]he back of his hand" when she told him no.  He was wearing a ring on the hand he used to slap her, and the slap resulted in a "huge" bruise.  She stated that when he raped her it "hurt."  A few hours after the rape, she noticed "blood all over [her] panties[,]" and upon informing the Defendant of this, he told her to throw the underwear behind the washing machine.  The Defendant later retrieved the panties and showed them to the victim's mother, who confronted her with them.  The victim told her mother that she thought she had started her period and "freaked out so [she] throwed [sic] it behind the washer."  She also told her mom that she got the bruise on her face when she was playing basketball with her sister and her sister hit her in the face with the ball.

---

[2]  It is the policy of this court to refer to rape victims by their initials.

The victim recounted that one afternoon, she was reading a Harry Potter book on her bed, when the Defendant came into her room. He "grabbed the book" from her and "told [her] to take off [her] clothes and get on [her] hands and knees." According to the victim, the Defendant had previously tried to anally rape her but stopped because she started screaming and her mother was due home. Despite this fact, she complied with the Defendant's demands to get on her hands and knees this time because she was afraid of him. The Defendant then stuck "his penis up [her] butt," which she stated "hurt really bad." During the ordeal, the Defendant instructed her to watch out the window for her mother's return from her neighbor's house. She tried to get away, but the Defendant overpowered her. When asked about the measures she took to try to get away from the Defendant, she responded: "I would push away, and he would grab my arms and just lock on. And sometimes he would grab my hair or he would slap me or anything that I tried to get away, but he wouldn't let me." After anally penetrating her on this occasion, he turned her over, "[p]ut the white stuff on [her] bed[,]" and instructed her on "rule number one." He then "wiped it off with the cover[,]" put his pants back on, and "acted like nothing ever happened." Following this rape, she could not go to the bathroom without severe pain for a period of time.

Next, the victim recalled an incident when, just after getting a new television satellite, she was lying on the sofa eating and watching the children's cartoon "SpongeBob SquarePants" on the television. According to the victim, it was approximately 7:10 a.m. on a weekend morning, and her mother and sister were still asleep. The Defendant came into the living room in his "orange and white Tennessee pajamas" and said they needed to hurry before the victim's mother woke up. She said, "What are you talking about," and he said, "You'll see." He then took off the victim's pants, spread her legs open, and "started penetrating [her.]" The Defendant put his hands on either side of her neck during this encounter. She did not fight him because she was afraid of him by this time as he had already hit her in the face and "pulled [her] hair and everything, so [she] learned not to do anything."

The victim testified of another anal rape that took place in the Defendant and her mother's bedroom when she was looking at some of her dead grandmother's pictures. The Defendant came in and took the pictures from her, telling her she was "done[.]" The Defendant then removed their clothes. He then "bent [the victim] over at the foot of their bed, and he started putting his penis in [her] butt." Although no one else was home, she started screaming and crying. The victim said that on this occasion, she fought with the Defendant, trying to get away from him; however, the Defendant pulled her hair and backhanded her with his ring hand. When he finished, "he had white stuff all over the bed" and again informed her of "rule number one." The victim stated that the Defendant never

"put anything on his penis . . . [t]o prevent her hurting[,]" and after this rape, it hurt when she walked for two or three weeks.

The victim relayed that on yet another occasion, when she and the Defendant were home alone after school, the Defendant taped her to his bed with black electrical tape "with white letters and numbers on it[.]" She was naked lying on her back; the tape was wrapped around her waist, and her arms were taped diagonally to the corners of the bed. The tape came from a "junk drawer" in the kitchen. The victim opined that the tape was from her neighbor's, Daisy Leib's, move because Ms. Leib used the same kind of tape to pack her belongings; Daisy "was supposed to be out by April 12th, but she kept moving her stuff." According to the victim, this episode "was actually the one time [the Defendant] had actually had white stuff in [her] and then it also went onto the bed." The victim claimed that, when the Defendant went to untie her, he ripped the tape off of her arms, removing hair. The Defendant again threatened her with "rule number one." After her mother noticed that hair was missing from her arms, she told her mother that she and her sister had been playing a game.

The victim reported another rape that took place five or six days after her birthday. This rape occurred on a school day in the Defendant and her mother's bedroom.

The victim testified that another rape took place while she recovered from a burn injury suffered in a motorcycle accident. She was out of school due to her injury. She was lying on the couch, and the Defendant pulled her shorts down over the burn on her leg, causing her to cry. When she cried, the Defendant slapped her on the face before pulling her legs apart and penetrating her. It hurt when "he was going up and down" because "he would land on" her injured leg.

The victim claimed that another sexual encounter occurred when the Defendant showed her a pornographic magazine he kept in his bedroom. He displayed the magazine to her and started "jacking off." He then made the victim lie down on the bed even though she did not want to, and he "started rubbing on [her]" while having her look at the magazine. He touched her vagina with his hand, "just rubbing all of [her]." "White stuff" came out and he put it on her stomach. She testified that the Defendant showed her this magazine on at least three separate occasions; one picture included a girl with "her legs up, and the guy's penis was just laying on her."

The victim testified that at times, the Defendant took pictures of her with a disposable camera and with a digital camera. During these encounters, the Defendant would often force her to look at the pornographic magazine. Some pictures were of the victim naked, and some included the Defendant putting his penis on her vagina like the picture in the magazine.

-4-

"Sometimes[,]" he also photographed touching her vagina with his mouth. She complied with his requests because she "didn't want to get beat." According to the victim, the Defendant kept these pictures in a box under his bed.

The victim testified that she kept a journal of the rapes because her counselor had instructed her to write things down. She kept that journal behind a loose board in her bedroom closet.

The victim admitted that she burned their mobile home down. The night before the fire, she packed clothes for her family so that they could leave quickly once the fire started; she put the clothes in a backpack and a suitcase and placed them in her closet so she "could just grab it and get [her sister] out of the house." She stated that she set fire to the mobile home because she "was afraid that if [she] . . . told [her] mom, she wouldn't believe [her], she would end up going back to [the Defendant] and it would have just happened over again, and [she] had to get away from it." Initially, her mother did not believe her about the abuse, but she changed her mind when the victim asked to be taken to a doctor.

The victim recounted that she had been sexually abused by her father when she was five years old. She did not remember any details from her father's abuse, but she knew he put his penis into her. He did not have anal sex with her or tape her to a bed. She did not recall her father ever showing her any pornographic material. Her father did not hit her or take pictures of her. She did not bleed or have blood in her underwear after the abuse by her father.

On cross-examination, the victim was asked about her interview with Captain Penny Baker following the abuse by her father. She did not recall most of the details of the interview; she did not remember describing the term "jacking off"; discussing her cousin Victoria; or telling about her father making her "watch a really nasty movie with a woman sucking a man's d--k and a woman having sex with a boy[.]" She acknowledged that she made a similar allegation against the Defendant, telling investigators that the Defendant made her watch pornographic videos "involving little girls performing oral sex on a grown man[.]"

The victim acknowledged that she initially lied to her mother and the police about her role in burning the mobile home. She admitted to fabricating a story about receiving a death threat prior to burning down the trailer herself. She also testified that her neighbor's trailer was burned down about one week before she burned down her own trailer. She explained that she saw three individuals at the neighbor's house with lighters "messing with it[.]" They went behind the house, "[a]nd as soon as they left, there was smoke coming from the house." She tried to take pictures of the individuals with a disposable camera but was not certain "if there was actually pictures on the camera." However, she admitted that she did not actually

witness the three individuals set fire to Ms. Leib's trailer. She recalled that Ms. Leib said, in front of her, her mother, and the Defendant, that once she moved out of the trailer, she was going to pay the Defendant or her boyfriend to burn down the residence, which was in foreclosure. She denied burning her hand the day Daisy Leib's trailer burned and insisted that the burn on her hand happened when she burned down her own mobile home.

The victim also admitted that she had gotten into trouble in school for lying. She told a boy at school, that in the event he ever hurt her, her mother said she was "not afraid to go back to prison." However, her mother had never been to prison. The victim explained that it was a joke that she heard her mother repeat from a television program. The boy reported that she had threatened to kill him with a gun, and she received detention for two weeks.

When asked if her mother was open about sexual matters, the victim replied that "[i]t depends on what it was. . . . [I]f I had questions, she would answer them because I was becoming a teenager, but she never like exposed it to me." The victim further stated that she never saw her mother have sex with any of her boyfriends and that her mother did not describe oral sex or masturbation to her.

The victim's mother testified. She recounted the incident where the Defendant told her that there were dirty panties behind the washing machine. After retrieving the panties, she saw that the "whole crotch area was bloody" and determined, by the brown color, that the blood had already dried; she then asked the victim if she had started her period. She also remembered seeing a bruise on the victim's face, which the victim told her resulted from her sister hitting her in the face with a basketball. On another occasion, she also noticed that the victim had "couple of patches" of hair missing from her arms; the victim again told her that the injury resulted from playing a game with her sister. She further confirmed that the Defendant was often home alone with the victim; that the victim liked to read books, including the Harry Potter series; that the victim suffered a burn during a motorcycle accident; that they owned digital and disposable cameras; that they purchased a television satellite; that she had seen black electrical tape in the Defendant's "junk drawer" in the kitchen; that the Defendant sometimes wore a ring; and that, at first, she had trouble believing the victim about the rapes.

The victim's mother confirmed that she and Ms. Leib were friends and that she often went to Ms. Leib's residence to visit. She testified that she was present when Ms. Leib asked the Defendant to burn down her trailer. This conversation, involving only these three individuals, occurred two to three weeks before the actual fire.

On cross-examination, she acknowledged that the victim had a "problem[] lying" sometimes. She detailed the incident where the victim got into trouble at school.

-6-

Richard Foschino, a retired detective from the Campbell County Sheriff's Department, investigated the May 29, 2008 fire at the victim's mobile home following a 911 call by the victim. The victim initially denied setting the fire. At first, the victim told Det. Foschino that someone called her house the night before with a death threat, saying "you're gonna die and hung up, said, I burned downed Daisy's house, your house is next." The victim also described to Det. Foschino "how she woke up to smoke in the bedroom, had to crawl to the living room." As Det. Foschino investigated further, he began to think that the victim was not being truthful, noting the following details as unusual or inconsistent: (1) the victim had packed the family's belongings the night before the fire; (2) the victim's "tone" during the 911 call was "very calm"; (3) there was no phone record of a call to the house the night before the fire; and (4) the logistics of the fire and the victim's version of events. Eventually, the victim confessed that she set the fire, claiming that she did so in order to get away from the Defendant, who was raping her, and that she was afraid to tell her mother about the abuse. According to Det. Foschino, the victim's mother initially "had a lot of trouble believing it[,]" and "they were both pretty upset." In response to her mother's disbelief, the victim stated to her mother and Det. Foschino that "she could prove it" if they would take her "to the doctor" for an examination.

Based upon information from the victim, Det. Foschino went to the trailer to look for the victim's journal and some pornographic material. During his search, Det. Foschino photographed the burned home, including the area in the master bedroom where he found a pornographic book. He was unable to find any remnant of the victim's journal. He did not see a burn on the victim's hand during his investigation of this fire.

Detective Foschino also testified that he talked to the victim after the fire at Ms. Leib's house. When asked if the victim informed him who set fire to that trailer, he replied no, stating that she told him "she saw some other children from the neighborhood behind the house and saw that one of them had a lighter and when they came out from behind the house a few minutes later, she saw the smoke." The victim gave Det. Foschino a camera that day; however, he got the film developed, and there was nothing "at all about the fire at [Ms. Leib's house[.]" According to Det. Foschino, the victim did not have a burn on her hand the day he investigated the neighbor's fire, and he was more certain of this fact because he had more interaction with the victim on that day. He was unable to determine who set fire to Ms. Leib's trailer, but Det. Foschino never pursued the victim as a suspect.

Gail Clift, a pediatric forensic nurse practitioner, examined the victim on June 11, 2008, in response to the allegations against the Defendant. At that time, the victim did not have any burn injuries on her hands, but she did have a large scar on her leg. After conducting an exam of the victim's genitalia, Ms. Clift observed a tear in her hymen

"between the 7:00 o'clock mark and the 10:00 mark," also referred to as a "transsection injury." According to Ms. Clift, this type of injury could only be caused by penetration.

Ms. Clift acknowledged that she and her collaborating physician, Dr. Mary Perales, disagreed on the case, which was not a common occurrence. In this case, Dr. Perales determined that the victim had a normal hymen.

Ms. Clift testified that she obtained the exam conducted on the victim in 2003. Although the doctor who examined her in 2003 saw a "slight thickening" of the hymen "between 6:00 and 8:00," the doctor described the hymen "as not having an injury."

That concluded the State's proof. The Defendant's motion for judgment of acquittal was denied, and he called the following witnesses in his defense.

Captain Penny Baker, of the Anderson County Sheriff's Office, interviewed the victim in 2003 following the allegations of abuse by the victim's father. Captain Baker recalled that the victim relayed a conversation she had with her cousin Victoria; they discussed Victoria's having sex with her boyfriend. The victim described the term "jacking off" as something she had seen her father do and as something that had been explained to her by Victoria.

Doctor Mary Patricia Perales testified that, in her assessment, the victim's exam was "normal." She had only disagreed with Ms. Clift "a handful" of times, "not very many." When asked if they only differed based upon the proper terminology, Dr. Perales said, "No. I think that she feels like she saw a transsection there, and she can't prove it to me with the picture and video." When asked if there was any significance between the 2003 findings and Ms. Clift's "finding of a transsection between 7:00 and 10:00," Dr. Perales replied, "I do think there is. Already, we already know that her 6:00 and 10:00 area, or what I call her left area looks different than her right. It looked different even in 2003." Dr. Perales confirmed that a "normal exam" did not rule out sexual abuse.

Tonya Templin testified that she was the office manager of Universal Weld Service, where the Defendant was employed. The Defendant's time records reflected the following for certain dates in April and May 2008: on April 19, 20, and 21, he was off; on April 22, he came in to work at 8:00 a.m. and clocked out at noon; on April 23, he arrived at work at 4:30 a.m. and left to go home at 3:30 p.m.; on April 24, he worked from 4:30 a.m. to 12:30 p.m.; on April 25 he worked from 4:30 a.m. to 4:00 p.m.; on April 26 and 27, he was off duty; on April 28, he worked from 4:30 a.m. until 6:30 p.m.; on April 29, he worked from 8:00 a.m. until 1:00 p.m.; on April 30, he worked 4:00 a.m. until 3:00 p.m.; on May 1, he worked from 8:00 a.m. until 3:30 p.m; May 2, he worked from 8:00 a.m. until 10:30 a.m.; and on May 3 to 11, he was on vacation.

Tim Waugh, the Defendant's supervisor, confirmed the hours for the days listed above. Mr. Waugh never had a problem with the Defendant or anyone else "not being on the job when they are clocked in[.]"

Detective Foschino was recalled to testify about the rape alleged to have occurred five or six days after the victim's birthday. He stated that, given the victim's date of birth, he arrived at an approximate offense date of April 25, 2008.

The Defendant testified on his own behalf at trial. He claimed that he loved the victim "like a dad" and denied ever touching the victim in a sexual manner or penetrating her in any way. He suggested that she made up the rapes to get out of trouble for burning down their house. He testified that the victim lied about the incident where he discovered panties behind the washing machine; he saw the panties, but he never suspected that there was blood on the clothing. On one occasion, he did notice a bruise on the victim's face, but upon questioning by him and the victim's mother, the victim said that her sister threw a shampoo bottle at her when they were in the bathtub together. He claimed he never had a digital camera during the time they lived in the trailer. He also did not recall "[t]he little box" the victim talked about; he did have "a big white box," but it was too big to fit under the bed. He confirmed that he frequently wore his Tennessee pajamas that the victim described.

The Defendant admitted that he and the victim's mother kept pornography in the house but claimed it was outside the view of the children. According to the Defendant, the victim's mother was very open about sexual matters with the children, including describing sex, oral sex, masturbation, and the taste of semen. He also asserted that the victim had witnessed her mother having sex with other men and that the victim's mother told the victim that "her p---y tasted good." When he "fussed at" the victim's mother for this type of behavior, she just "laugh[ed]." He claimed that the victim's mother told him "[t]hat [the victim] always tried to get her and her other boyfriends into fights. She caused trouble between them all the time."

The Defendant admitted to being present, along with several others, when Ms. Leib offered money to anyone who would burn down her trailer. According to the Defendant, the victim overheard this conversation, and she had a burn on her hand the day Ms. Leib's trailer burned. He said he was at work when this fire happened.

The State called the victim's mother in rebuttal. She said that the victim never caused any problems between her and her other boyfriends.

Based upon the foregoing evidence, the jury found the Defendant guilty as charged. A sentencing hearing was held on October 26, 2009, and the trial court filed a "Sentencing

Findings of Fact" order on November 5, 2009. The trial court imposed an 18-year sentence for each rape of a child conviction, with service as Child Rapist at 100%, and a 10-year sentence for the aggravated sexual battery conviction, with service at 30% as a Range I, standard offender. The trial court ordered that counts one and two for rape of a child be served concurrently with each other and, likewise, for counts three and four and counts five and six. The court ordered consecutive service of each pair of 18-year sentences, followed by consecutive service of the 10-year sentence, resulting in a total effective sentence of 64 years in the Department of Correction. This appeal followed.

## ANALYSIS

On appeal, the Defendant raises the following issues for our review: (1) whether the trial court erred by excluding sexual entries from the victim's MySpace page as irrelevant and inadmissible; (2) whether the trial court erred by allowing evidence of the victim's prior sexual history to be used only for impeachment purposes; (3) whether the evidence was sufficient to support the Defendant's convictions; and (4) whether the Defendant's effective 64-year sentence was excessive.

### I. Tennessee Rule of Evidence 412

The Defendant contends that the trial court made two erroneous evidentiary decisions. Both issues concern Tennessee Rule of Evidence 412, regarding limiting evidence of a victim's sexual behavior.

First, the Defendant sought to introduce several entries from the victim's MySpace account. The entries included numerous sexual remarks allegedly made by the victim on her MySpace page—entries where the victim listed her occupation as a "whore," making less than $30,000; listed her hero as her "sexy boyfriend Rob"; claimed to be a 16-year-old, gay male; claimed to be expecting a child; and called herself a "sexy sweetheart." In his written offer of proof, the Defendant contended that "[t]his evidence would be introduced for the purpose of explaining the source of injury and the alleged victim's knowledge of sexual matters." At the hearing on the motion, defense counsel also argued that the outlandish nature of the entries showed the victim's propensity to lie. The trial court excluded the MySpace entries relying on rules of relevance.

Second, the Defendant sought to have Captain Baker testify to statements made by the victim about the abuse she suffered in 2003 at the hands of her father. According to the Defendant, in the 2003 statement, the victim described being molested and sexually abused by her father and volunteered, "No, but I have had sex with my cousin J.J.," who gets "really horny." In his written offer of proof, the Defendant contended that "[t]he purpose of introducing this evidence would be to explain the unusually high level of sexual knowledge

-10-

possessed by the [victim] as well as the source of injury." At the hearing, it was revealed that the victim's father was convicted of aggravated assault for his abuse of the victim. The trial court allowed evidence pertaining to the prior abuse by the victim's father to a large degree but prohibited the defense from putting on proof of all of the specifics surrounding that abuse.

The Tennessee Rules of Evidence establish specific guidelines for admitting evidence of a victim's sexual behavior. Specifically, Rule 412 governs the admissibility of evidence about a sex crime victim's prior sexual acts. According to the Advisory Commission Comments to Rule 412, these guidelines have been established to maintain "a balance between the paramount interest of the accused in a fair trial and the important interests of the sexual assault victim in avoiding an unnecessary, degrading, and embarrassing invasion of sexual privacy."

Subsection (b) of the rule deals with the admissibility of reputation or opinion evidence and subsection (c) governs the admissibility of specific instances of conduct. In this case, subsection (c) provides the relevant authority for the evidence the Defendant sought to introduce. Subsection (c) states as follows:

(c) Specific instances of conduct. Evidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule, and the evidence is:
    (1) Required by the Tennessee or United States Constitution, or
    (2) Offered by the defendant on the issue of credibility of the victim, provided the prosecutor or victim has presented evidence as to the victim's sexual behavior, and only to the extent needed to rebut the specific evidence presented by the prosecutor or victim, or
    (3) If the sexual behavior was with the accused, on the issue of consent, or
    (4) If the sexual behavior was with persons other than the accused,
        (i) to rebut or explain scientific or medical evidence, or
        (ii) to prove or explain the source of semen, injury, disease, or knowledge of sexual matters, or
        (iii) to prove consent if the evidence is of a pattern of sexual behavior so distinctive and so closely resembling the accused version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe the victim consented.

Tenn. R. Evid. 412(c). It is a rule of relevance, see State v. Brown, 29 S.W.3d 427, 430 (Tenn. 2000), and we will not overturn a trial court's Rule 412 ruling absent an abuse of discretion. State v. Sheline, 955 S.W.2d 42, 46 (Tenn. 1997).

Before evidence of a victim's sexual behavior may be admitted at trial, the accused must file a written motion ten days prior to trial, accompanied by an offer of proof describing the specific evidence and the purpose for introducing it. Tenn. R. Evid. 412(d)(1). After notice has been given, the trial court must conduct a jury-out hearing to determine whether the evidence is admissible. Tenn. R. Evid. 412(d)(2). "If the court determines that the evidence which the accused seeks to offer satisfies subdivisions (b) or (c)" of the rule, then the court must decide whether the probative value of the evidence outweighs the risk of unfair prejudice to the victim. Tenn. R. Evid.(d)(4). "[T]he evidence shall be admissible in the proceeding to the extent an order made by the court specifies the evidence which may be offered and areas with respect to which the alleged victim may be examined or cross-examined." Id.

Here, the defendant properly filed a Rule 412(d) motion. The trial court held a hearing to determine the admissibility of the evidence. We will address each of the issues presented by the Defendant in turn.

*A. MySpace Entries*

At the hearing, the Defendant stated that his oldest daughter called to tell him that she had seen the victim on the internet. He went to the public library to access the victim's MySpace page; he printed the entries there. The Defendant claimed that he did not help the victim set up her MySpace account, that she set it up on her own, and that he did not know her password. He relayed that he was able to access the entries without a password as they were available to anyone. When asked if he had the ability to make entries in the victim's MySpace account, the Defendant responded in the negative.

The victim testified that the Defendant set up her MySpace page and that they were the only two who had the password to her account. She claimed that the Defendant "did it all" because she "didn't even know how to set up a MySpace." According to the victim, she had not accessed the MySpace account since their trailer burned. She asserted that she did not make any of the MySpace entries which the Defendant sought to introduce. She acknowledged that she did have a boyfriend named Rob but claimed that their relationship was not sexual. According to the victim, the Defendant did not approve of the victim's relationship with Rob.

First, the trial court found that the MySpace entries were not evidence of the victim's "sexual behavior" within the ambit of Rule 412. The trial court then went on to examine the

entries under rules of relevance, Tennessee Rules of Evidence 401 through 403. Ultimately, the trial court determined that the evidence was inadmissable because the entries were not definitely attributable to the victim, they were an attempt to reflect on the victim's character, they could lead to jury confusion, and they were more prejudicial than probative.

On appeal, the Defendant argues that the evidence was relevant to the victim's credibility to show not only that the victim had a history of telling lies, but that she was continuing to do so after accusing the Defendant of sexual abuse. The Defendant states that it was evident that the trial court was concerned with the authenticity of the statements under Tennessee Rule of Evidence 901. The Defendant cites to Melissa L. Bright Dockery v. Kevin Carl Dockery, Sr., in which the Court of Appeals addressed Rule 901 as it related to the MySpace entries in that case. No. E2009-01509-C0A-R3-CV, 2009 WL 3486662 (Tenn. Ct. App. Oct. 29, 2009) (defendant convicted of two counts of criminal contempt for violating an order of protection based on content of two MySpace messages). In accordance with the rationale of the Dockery court, the Defendant contends that he verified that he had printed the entries directly off the victim's homepage and he did not alter the homepage in anyway. Therefore, he submits that the entries were properly authenticated by a witness with knowledge and, thus, admissible. According to the Defendant, any issue about his credibility should have been left to the jury.

The State responds that the Defendant has failed to show that the trial court abused its discretion when it determined that the proffered evidence on the victim's MySpace page was irrelevant and overly prejudicial when the victim denied accessing her account to enter such details. The State submits that none of the entries were probative to the victim's credibility where she denied making them at all and that, even making those postings, would not be probative to her credibility in any forum where the claims were so outlandish. Further, according to the State, the evidence is not admissible as a prior inconsistent statement because the Defendant failed to prove that the victim made the statements at all.

First, we must address the trial court's ruling that the MySpace entries were not governed by Rule 412. By its definition, Rule 412 applies to the victim's "sexual behavior." "Sexual behavior" is further defined by the rule as "sexual activity of the alleged victim other than the sexual act at issue in the case." Tenn. R. Evid. 412(a). "This broad definition 'deals with sexual intercourse as well as every other variety of sexual expression.'" Sheline, 955 S.W.2d at 47 n.6 (considering the victim's kissing another person on the evening of the offense under Rule 412) (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 412.2, at 241 (3d ed. 1995)). The treatise Tennessee Law of Evidence, cited in Sheline, further expounds on "sexual behavior" as follows:

> The term sexual behavior embraces all types of sexual conduct, including heterosexual and homosexual behavior. It also deals with sexual intercourse as well as every other variety of sexual expression. It may include fetishes as well as pre-and post-intercourse behavior. However, "sexual behavior" does not include prior false allegations of rape. This information does not involve sexual expression, which is the essence of "sexual behavior" under Rule 412.

Neil P. Cohen et al., Tennessee Law of Evidence § 4.12[3][b], at 4-176 (5th ed. 2005) (internally citing State v. Wyrick, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001)). In Wyrick, this court concluded that false allegations of rape were not "sexual behavior."

In State v. Michael Davenport, this court addressed the admissibility of testimony by the Defendant's mother that she heard the victim's mother discuss with the victim what her first time having sex would be like. No. M2006-01693-CCA-R3-CD, 2008 WL 2368931, at *8 (Tenn. Crim. App. June 10, 2008). This testimony was "relevant to whether the victim was being truthful when declaring she gained this sexual knowledge from the Defendant." Id. The court held that "a conversation about sex is 'sexual behavior' and falls under Rule 412." Id. at *10. In so concluding, the panel reasoned as follows:

> [A] conversation about sex is more akin to 'sexual expression' and 'pre- and post-intercourse behavior' than a false allegation of rape. Within the spirit of the rule, we can certainly envision a scenario when a [d]efendant would like to question a victim about her history of sexual discourse, as it might be especially probative of the victim's basis for sexual knowledge. See Tenn. R. Evid. 412(c)(4)(ii). Face to face conversation, internet discussion, and phone discussions would all fall under this rule.

Id. This is precisely the scenario at issue here, i.e., the Defendant sought to admit evidence about the victim's history of sexual discourse. Thus, in accordance with Davenport, we conclude that the MySpace entries fall under the purview of Rule 412 and that the trial court erred when it concluded otherwise.

The trial court then examined the evidence under the rules of relevance. Evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Although relevant evidence is generally admissible, see Tennessee Rule of Evidence 402, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence[,]" see Tennessee Rule of Evidence 403.

-14-

Ultimately, the trial court determined that the evidence was inadmissable because the entries were not definitely attributable to the victim, they were an attempt to reflect on the victim's character, they could lead to jury confusion, and they were more prejudicial than probative. Specifically, the trial court reasoned as follows:

[F]rankly, I don't think it's relevant to anything. I think it's too fraught with --

. . . .

. . . [N]o one can pinpoint to her. And I don't want to step in where a jury ought to be there, but there is just simply too little connection between the witness and what shows up on the computer. It's almost like you're - an out of [c]ourt statement that . . . would reflect on her character. If -- if I knew this were a statement -- . . . if there was some connection between her -- I mean, a real connection between her and what showed up on the computer, then I might allow it, but this is -- I think it's so far out in right field, that I think it will lead to confusion to the jury, and I don't see it as being probative. I see the prejudice far outweighing any probative value as to the credibility of this witnesses.

Such a relevance analysis is incorporated with Rule 412. In subsection (d), the Rule provides that "[i]f the court determines that the evidence which the accused seeks to offer satisfies subdivisions (b) or (c)[,]" then the court must decide whether the probative value of the evidence outweighs the risk of unfair prejudice to the victim. Tenn. R. Evid. 412(d)(4). Thus, any error in failing to analyze the evidence in this case under Rule 412 was harmless.

Additionally, the Defendant states that it was evident that the trial court, by its ruling, was concerned with the authenticity of the statements under Tennessee Rule of Evidence 901; however, he references this rule of evidence for the first time on appeal. The trial court did not address Rule 901 at any point in the proceedings below, and we see no reason to do so now. Even authenticated evidence is subject to the standards of Rules 401 and 403.

We cannot conclude that the trial court abused its discretion by excluding the MySpace entries, considering the potential for confusion, their minimal probative value, and their prejudicial impact on the victim. The Defendant is not entitled to relief on this issue.

### B. Victim's Prior Sexual History

Next, the Defendant argues that the trial court erred in allowing evidence of the victim's past sexual history for impeachment purposes only. He submits that, where the victim acknowledged the prior abuse and her sexual knowledge as a result of that abuse,

-15-

extrinsic evidence of the victim's statements regarding the prior abuse should have been admissible to show another potential source of sexual knowledge, rebut her credibility, and explain the medical proof. The Defendant contends that "[i]ssues [the victim] raised during Capt. Baker's investigation were eerily similar to those she had claimed happened to her by [the Defendant]." He further alleges that the victim's past sexual history could have provided an alternative view to the medical testimony as to the source of the alleged injury to the victim's hymen. Finally, he contends that exclusion of extrinsic evidence in this vein denied him his constitutional right to confront the witnesses against him.

The State responds that the issue is waived because the Defendant failed to raise it in his motion for new trial and that he cannot show plain error where the trial court properly limited extrinsic evidence of the prior sexual abuse suffered by the victim. The State notes that the medical proof was extensively refuted at trial and that the victim's credibility was thoroughly tested. "The similar abuse suffered by the victim previously, as well as her prior sexual knowledge, was admitted at trial through the victim and Captain Baker's testimony." Thus, according to the State, plain error is not necessary to do substantial justice "where the jury heard the victim's prior sources of sexual knowledge."

At the Rule 412 hearing, the victim testified that she was interviewed by Captain Baker in 2003, when she was five years old, about the allegations of abuse by her father. The victim confirmed that she told Captain Baker that her dad had made her watch "dirty movies." She remembered telling about her father having her place her hands on his penis, that "it would feel mushy, and then it would start to point out when [she] touched it[,] . . . and that white stuff would come out." She also recalled informing the Department of Children's Services worker that her father threatened her with a knife, a needle, and a nail; while he did not threaten to kill her, he did say he would harm her if she told anyone. The victim did not recall telling Captain Baker that she had sex with her cousin J.J., who was 12 or 13 years old in 2003, "because he gets really horny." She denied ever having sex with J.J. She also did not recall telling Captain Baker that her cousin Victoria explained to her what "jacking off" meant.

When asked about the specifics of her father's abuse, the victim replied in the negative when asked if her father ever taped her to the bed during the abuse, ever penetrated her to such a degree that caused her to bleed into her panties, or ever performed anal sex on her. She also testified that her father never penetrated her with his penis. She claimed that, although her father had not done any of these things to her, the Defendant had done all of them. She further provided that the Defendant would threaten her with "rule number one" during the abuse—if she ever told anyone about the abuse he would kill her. She could not recall whether she had a physical exam after the abuse in 2003 but confirmed that an exam was performed after the allegations of abuse against the Defendant.

-16-

Captain Baker also testified at the hearing, detailing her interview with the victim in 2003 regarding the abuse by the victim's father. When asked if she believed the victim's testimony at the hearing was consistent with what she recalled from the interviews with the victim, Captain Baker replied: "It's consistent. The one part that she said she doesn't remember talking to me, of course, it has been several years ago so -- she did say that her dad had penetrated her." Captain Baker relayed that the victim detailed her father having her lie on him and "push up an down" and "that he would put his thing inside her and pointed to her vagina[.]" The victim also told Captain Baker that she had sex with her cousin J.J. When asked if she followed up on the allegation against J.J., Captain Baker said that, because J.J. was "a young boy[,]" she "never did really pursue it." Captain Baker opined that, in 2003, "it was obvious that [the victim] had been exposed to sexual activity and sexual talk."

The trial court ruled that the defense would be permitted to establish that the victim was previously sexually abused by her father. The trial court also further allowed examination of the victim on details of her father's abuse that were similar to the allegations she made against the Defendant, specifically, inquiry into the movies the victim's father made her watch because it was "similar enough" to her allegation that the Defendant made her watch pornographic movies involving adults and children. The trial court reasoned that the evidence of the prior abuse was relevant to explain the victim's source of sexual knowledge and possibly to explain or rebut scientific or medical evidence. Additionally, the trial court found that the probative value of the evidence outweighed the danger of unfair prejudice to the victim. Beyond that, the trial court ruled that the defense would not be allowed to delve into the specifics of the abuse the victim suffered at the hands of her father to show how that abuse compared to what the Defendant did to her.

Also, based upon the victim's testimony at the hearing that her father did not penetrate her, the trial court determined that the victim could be questioned about her statement to Captain Baker that her father did, in fact, penetrate her. If the victim denied the penetration at trial, the trial court ruled that the defense would be permitted to call Captain Baker to testify about the statement.[3] The trial court reasoned that this prior inconsistent statement was relevant for impeachment purposes. Based upon the evidence presented at the hearing, the trial court did not allow any inquiry into the statement the victim made about having sex with her cousin J.J.

Initially, as pointed out by the State on appeal, the Defendant failed to include this issue in his motion for new trial. In Tennessee, "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as

---

[3] Ultimately at trial, the victim testified that she was penetrated by her father.

waived." Tenn. R. App. P. 3(e); see State v. Keel, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994). However, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). This Court will grant "plain error" pursuant to Rule 36(b) only where the following five criteria are met:

> (a) The record . . . clearly establish[es] what occurred in the trial court;
> (b) a clear and unequivocal rule of law [has] been breached;
> (c) a substantial right of the accused [has] been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). If any of these five criteria are not met, we will not grant relief, and complete consideration of all five factors is not necessary when it is clear from the record that at least one of the factors cannot be established. Id. at 283. The defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial. State v. Banks, 271 S.W.3d 90, 119 (Tenn. 2008).

First, the record clearly establishes what occurred in the trial court. The Defendant complied with the procedural requirements of the rule, and the trial court conducted a hearing. A transcript of the hearing is included in the record on appeal.

Turning to the second Adkisson factor, we cannot conclude that plain error exists in this case because it is not evident that a clear and unequivocal rule of law has been breached. There is nothing in the record to show that the trial court violated Rule 412. The trial court's ruling regarding the evidence, permitting the Defendant to establish the prior abuse by the victim's father and allowing the Defendant to ask about details of the father's abuse when those details were similar to allegations the victim levied against the Defendant, was appropriate. At trial, the defense was permitted to inquire into some details of the sexual abuse by the victim's father, including the following: whether the victim's father ever threatened her with "rule number one"; whether her father ever hit her in the face, leaving a bruise; whether he ever had anal sex with her or taped her to the bed; whether she remembered him ever showing her any pornographic material; whether he ever took pictures of her with his penis laying on her vagina; and whether she ever bled after the abuse by her father. The defense was also allowed to call Captain Baker at trial. Captain Baker testified that she interviewed the victim following the allegations of abuse by the victim's father. Captain Baker testified to several statements the victim made during the interview, including

-18-

the following: the victim had knowledge that her cousin Victoria was having sex with her boyfriend; and the victim described the term "jacking off" as something she had observed her father do and as something that had been explained to her by Victoria. The Defendant was permitted to introduce much of the desired evidence, just not to his complete satisfaction. Moreover, as noted by the State, the victim's credibility was thoroughly tested at trial, and the medical proof was extensively refuted. In our view, the trial court conducted an appropriate analysis of this evidence pursuant to Rule 412 and did not abuse its discretion. Plain error relief is not warranted.

The Defendant also claims that the trial court's limitations on his ability to introduce extrinsic evidence of the victim's statements denied him his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. The United States Supreme Court has noted that "the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986) (citations and internal quotations omitted). However, the Supreme Court has further elaborated, "[T]he confrontation clause only guarantees 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense counsel might wish.'" See State v. Steven Otis Nicely, No. 03C01-9805-CR-00174, 1999 WL 826029, at *7 (Tenn. Crim. App. Oct.18, 1999) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 53 (1987)). The trial court in the instant case permitted the Defendant to ask the victim questions about details of the prior abuse when those details were similar to any of the allegations she made against the Defendant. The trial court was not required to permit wholesale inquiry into the details of the prior abuse.

We cannot conclude that a "clear and unequivocal rule of law" was breached in this case or, further, that consideration of the error is necessary to do substantial justice. The Defendant is not entitled to relief via plain error review.

## II. Sufficiency of the Evidence

The Defendant argues that the evidence was insufficient to support his convictions for aggravated sexual battery and six counts of rape of a child due to the numerous inconsistencies in the victim's testimony. Specifically, he makes the following allegations:

It is clear from [a] review of the transcript [the victim] is a very intelligent girl with a history of telling lies. Her lies are so elaborate that her mother had believed her stories about getting hit in the face with a basketball, playing a game in which she had ripped hairs from her forearms, and even about when the child had started her period. [The victim's] lies could be traced to a young age, where she claimed to having sex with her cousin, J.J., as well as her

-19-

father. This was rebutted by Dr. Perales stating [the victim's] hymen was normal in 2003 and normal in 2008 when she was interviewed by Gail Clift.

The State responds that the evidence is sufficient, noting that the victim testified "in frank detail" that the Defendant penetrated her sexually on numerous occasions and that he took a picture of his penis lying on her vagina. The State submits that the minor inconsistencies in the victim's testimony does not impact her testimony of the rapes and that the jury chose to accredit the victim's testimony despite the Defendant's attempts to discredit her and focus on ancillary details.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Regarding the Defendant's convictions for rape of a child, the State was required to prove "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim" and that the victim was "more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

In attacking the sufficiency of the evidence against him, the Defendant relies entirely on his opinion that the victim's testimony was not credible. The jury obviously credited the victim's testimony, however. It is well settled law in Tennessee that "the testimony of a victim, by itself, is sufficient to support a conviction." State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993).

Here the evidence supported the convictions for rape of a child. The State made clear elections both prior to trial and in its closing argument. Count one concerned the incident where the Defendant bound the victim with electrical tape. The Defendant taped the victim to his bed and penetrated her vagina. Count two referenced the rape that occurred on the old sofa in the victim's bedroom. During this episode, the Defendant penetrated the victim's vagina, causing her to bleed. Count three related to the episode when the victim was reading a Harry Potter book on her bed. This time the Defendant penetrated the victim in the anus. Count four concerned the events that occurred when the victim was watching "SpongeBob SquarePants" on the television. The Defendant penetrated the victim in the vagina during this incident. The rape in count five happened when the victim was in her mother and the Defendant's bedroom looking at some of her dead grandmother's pictures. The Defendant again penetrated the victim's anus. Count six related to the episode when the victim was recovering from a motorcycle injury, and the Defendant penetrated her vagina. In accordance with the charges delineated in the indictment, the proof reflected that count one happened in April 2008, that counts two through six occurred sometime between November 1, 2007 and May 2008, and that at all relevant times, the victim was less than 13 years old. Under the relevant statutes, these events constituted sexual penetration of the victim by the Defendant and, therefore, the rape of a child.

The Defendant was also convicted of aggravated sexual battery. This offense required the State to prove the "unlawful sexual contact with a victim by the defendant or the defendant by a victim " accompanied by one of a number of circumstances, including "[t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4). "Sexual contact" is "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6). Additionally, "'[i]ntimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." Tenn. Code Ann. § 39-13-501(2).

In this case, the evidence supported the conviction for aggravated sexual battery in count seven of the indictment. The victim testified that sometime between November 1, 2007, and May 2008, the Defendant laid his penis on her vaginal area and took photographs of this. The victim testified that the position which the Defendant sought to emulate in these photographs was similar to a picture he had previously showed to her in a pornographic magazine. She was less than 13 years old when the Defendant took the pictures. This evidence was sufficient to prove aggravated sexual battery.

### III. Sentencing

The Defendant challenges both the length of his individual sentences and the imposition of consecutive sentencing. On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999); see also State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008). If our review reflects that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see also Carter, 254 S.W.3d at 344-45.

In conducting a de novo review of a sentence, this court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). The defendant's potential for rehabilitation or treatment should also be considered. See Tenn. Code Ann. § 40-35-103(5).

### A. Length

The Defendant's conduct occurred after the enactment of the 2005 amendments to the Sentencing Act, which became effective June 7, 2005. The amended statute no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. As further explained by our supreme court in Carter,

> the trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]." [Tenn. Code Ann.] § 40-35-210(d). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," [Tenn. Code Ann.] § 40-35-102(1), a

punishment sufficient "to prevent crime and promote respect for the law," [Tenn. Code Ann.] § 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," [Tenn. Code Ann.] § 40-35-103(5).

Id. (footnote omitted).

The 2005 Amendment to the Sentencing Act deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered these factors merely advisory, as opposed to binding, upon the trial court's sentencing decision. Id. Under current sentencing law, the trial court is nonetheless required to "consider" an advisory sentencing guideline that is relevant to the sentencing determination, including the application of enhancing and mitigating factors. Id. at 344. The trial court's weighing of various mitigating and enhancing factors is now left to the trial court's sound discretion. Id. Thus, the 2005 revision to Tennessee Code Annotated section 40-35-210 increases the amount of discretion a trial court exercises when imposing a sentencing term. Id. at 344. To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See id. at 343; State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001).

Following his jury trial, the Defendant was convicted of six counts of rape of a child, a Class A felony, and one count of aggravated sexual battery, a Class B felony. See Tenn. Code Ann. §§ 39-13-504, -522. As a Range I, standard offender, the Defendant faced a potential sentence of 15 to 25 years for each of his Class A felony convictions and 8 to 12 years for his Class B felony conviction. See Tenn. Code Ann. § 40-35-112(a). The trial court imposed enhanced sentences of 18 years for each Class A felony conviction and an enhanced sentence of 10 years for the Class B felony.

After the sentencing hearing, the trial court filed a written order making sentencing findings of fact. The order reflected that, in setting the length of the Defendant's sentences, the trial court found three enhancement factors to be applicable to all of the Defendant's convictions. Those three factors were: (1) the Defendant had a previous criminal history—he had previously been convicted of assault; factor (6) the victim's injuries were particularly great; and factor (14) the Defendant abused a position of private trust. See Tenn. Code Ann. § 40-35-114(1), (6), & (14). The trial court found no evidence that any mitigating factors applied. See Tenn. Code Ann. § 40-35-113. Although not included in the written order, the trial court, in issuing its oral findings from the bench at the sentencing hearing, also found that enhancement factor (5) applied, that the Defendant treated the victim with exceptional

cruelty. See Tenn. Code Ann. § 40-35-114(5). In applying factor (5), the trial court reasoned as follows:

> The State has relied upon the proof at trial, the victim's testimony specifically, and also the testimony of Gail Clift who was identified as a forensic nurse and specializing in the field of child sex victims. There was -- there was some evidence that suggested there was cruelty. Of course, cruelty is -- in this case is to be considered a legal term. It could mean lots of things to different people, but I do find that there was evidence of cruelty -- exceptional cruelty by the [D]efendant against the victim in this particular case, and I'm gonna find that there was -- there is evidence to support that and will give it its appropriate weight.

On appeal, the Defendant argues that the victim was not treated with exceptional cruelty, citing to the many discrepancies in her testimony. He contends that, if the victim was not abused rectally and there was no damage to the anus, then there could not have been any physical trauma. There was no direct forensic evidence related to any injury to the victim's anus and damage to the victim's hymen was disputed. The Defendant asserts that the State did not prove the injuries were any greater than those which would ordinarily result from this type of offense.

The State responds that, because the trial court affirmatively demonstrated its consideration of the sentencing principles and all relevant facts and circumstances before enhancing the Defendant's sentences within the applicable range, the Defendant's sentence should be afforded a presumption of correctness. The States then asserts that the record supports the trial court's consideration of properly applicable enhancement factors and that the trial court properly utilized its discretion to sentence the Defendant within the applicable range. With regard to the exceptional cruelty factor, the State submits that this factor was properly applied because the Defendant repeatedly raped the victim both anally and vaginally under circumstances that caused her to bleed, have trouble using the bathroom, and suffer great pain. He also disregarded her screams, protestations, fighting, and resistance to raping her. He slapped or hit her when she cried on several occasions, and he taped her to a bed to rape her on another occasion.

The Defendant only challenges the trial court's application of the exceptional cruelty factor and does not challenge application of any of the remaining factors. First, we conclude that the record supports the trial court's application of factor (5), that the Defendant treated or allowed the victim to be treated with exceptional cruelty. In any event, the trial court also found that a number of other factors applied, factors (1), (6), and (14), and the record supports their application. This court has held that application of even a single factor may

be sufficient to justify an enhanced sentence. See, e.g., State v. Eric D. Charles, No. W2007-00060-CCA-R3-CD, 2008 WL 246023, at *6 (Tenn. Crim. App. Jan. 30, 2008); State v. Shawn McCobb and Marcus Walker, No. W2006-01517-CCA-R3-CD, 2007 WL 2822921, at *4 (Tenn. Crim. App. Sept. 26, 2007). Moreover, in its written sentencing order, the trial court did not apply factor (5); nonetheless, the trial court still imposed the same sentence as it indicated at the sentencing hearing. This written finding evinces the trial court's decision that these three factors carried enough weight to support the enhanced sentences, and the weight to be given the various factors is within the broad discretion afforded our trial courts. We conclude that the trial court did not err or abuse its discretion in setting the Defendant's various sentences at 18 and 10 years.

*B. Consecutive Nature*

As his last issue, the Defendant challenges the consecutive nature of his sentences. Tennessee Code Annotated section 40-35-115(b) provides that a trial court may, in its discretion, order sentences to run consecutively if it finds any one of the following criteria by a preponderance of the evidence:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;
> (2) The defendant is an offender whose record of criminal activity is extensive;
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
> (6) The defendant is sentenced for an offense committed while on probation; or
> (7) The defendant is sentenced for criminal contempt.

These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing. However, the imposition of consecutive

-25-

sentencing is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" Tenn. Code Ann. § 40-35-103(2) & (4).

In the written order wherein the trial court made sentencing findings of fact, the trial court imposed consecutive sentences on the basis that the Defendant was convicted of two or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances, the time span of the activity, the nature and scope of the acts, and the extent of damage to the victim. The written sentencing order does not contradict the trial court's findings at the sentencing hearing. At the sentencing hearing, the trial court referenced that the State sought consecutive sentencing on two grounds—first, that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high, and second, that the Defendant was convicted of two or more offenses involving sexual abuse of a minor. The trial judge declined to apply the dangerous offender category; finding that he was not "convinced" on that basis to order consecutive sentences.

On appeal, the Defendant argues that the trial court erred by concluding that he was a dangerous offender. The Defendant asserts that the trial court did not make the findings required by State v. Wilkerson, to sentence him as a dangerous offender, i.e., that the terms imposed were reasonably related to the severity of the offenses committed and were necessary in order to protect the public from further criminal acts by the offender. See 905 S.W.2d 933, 938 (Tenn. 1995). Addressing the Wilkerson factors, the Defendant submits that his effective 64-year sentence is excessive because it is not reasonably related to the severity of the offenses and his potential ability to harm the public in the future is minimal. He asks for a remand. The State replies that the trial court properly relied on the Defendant's four offenses involving sexual abuse of a minor in ordering consecutive service of his rape of a child sentences and the aggravated sexual battery sentence.

We agree with the State. As noted above, the trial court did not impose consecutive sentencing based upon a finding that the Defendant was a dangerous offender. The transcript of the sentencing hearing is not in conflict with the written order. Because no finding was made that the Defendant was a dangerous offender, the trial court was not required to make the findings outlined in Wilkerson.

Here, the trial court found that criterion (5) applied to Defendant's case. The Defendant makes no challenge to this finding, and the record supports this conclusion. The jury convicted the Defendant of six counts of rape of a child and one count of aggravated sexual battery based on his abuse of the victim over a seven-month period, and the State

-26-

presented testimony about the impact of this sexual relationship on the victim. The presence of a single factor is enough to justify the imposition of consecutive sentencing. Under these facts and circumstances, partial consecutive sentencing is an appropriate and justly deserved sanction. We affirm the sentence imposed by the trial court and conclude that it is no greater than that deserved for the offenses committed.

## CONCLUSION

For the reasons articulated above, we affirm the Defendant's convictions and sentences.

_____
D. KELLY THOMAS, JR., JUDGE