IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 28, 2020 Session

**JOSEPH NATHANIEL NANCE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Campbell County**
**No. 16386      E. Shane Sexton, Judge**

_____

**No. E2019-00566-CCA-R3-PC**
_____

In 2009, a Campbell County jury convicted the Petitioner, Joseph Nathaniel Nance, of six counts of rape of a child and one count of aggravated sexual battery, and the trial court sentenced him to sixty-four years of incarceration. The Petitioner appealed his convictions to this court, and we affirmed the judgments. *State v. Nance*, 393 S.W.3d 212 (Tenn. Crim. App. 2012). Subsequently, the Petitioner filed a petition for post-conviction relief, claiming that he received the ineffective assistance of counsel, which the post-conviction court denied after a hearing. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ROBERT H. MONTGOMERY, JR. and TIMOTHY L. EASTER, JJ., joined.

Darren F. Mitchell, Jacksboro, Tennessee, for the appellant, Joseph Nathaniel Nance.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Jared R. Effler, District Attorney General; and David M. Pollard, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts and Background**

This case originates from the Petitioner's repeated rape of the minor victim, his girlfriend's daughter, inside the home they shared. Based on these events, a Campbell County grand jury indicted the Petitioner for six counts of rape of a child and one count of aggravated sexual battery.

# A. Trial

The following is a truncated version of this court's summary on appeal of the facts presented at trial:

[The victim] provided that her birthdate was April 20, 1997, thus, making her 12 years old at the time of trial. She testified that in November 2007, she moved into a mobile home in Campbell County with her mother, her sister, and the [Petitioner], who was one of her mother's "ex-fiances." At that time, she was in the fifth grade. Because the victim's mother was employed at McDonald's in Lake City working [fluctuating] shifts, the [Petitioner], who was a truck driver, was often alone with the victim and her sister. According to the victim, the rapes took place in the [Petitioner] and her mother's bedroom, her bedroom, and the living room of the home. During many of the episodes, the [Petitioner] advised the victim of "rule number one"—that he would kill her if she told anyone about the rapes.

The victim testified that on one occasion, the [Petitioner] called her into his bedroom to help clean and simultaneously sent her sister outside to rake leaves. According to the victim, there were "no leaves in the yard because it was like spring or right before fall." The victim testified that once inside the bedroom, the [Petitioner] took her clothes off and pushed her down on the bed. He then spread her legs and put his penis all the way inside her. The victim told the [Petitioner] that she "didn't want to," but the [Petitioner] said, "Well, too bad[.]"

According to the victim, another rape occurred on an old, pink sofa in her bedroom when her mother was at work and her sister was away from the house. The [Petitioner] pushed her down onto the sofa and removed her pants. The [Petitioner] "started to put his penis inside" her. She told him no and tried to push him off, but he slapped her in the face with "[t]he back of his hand" when she told him no. He was wearing a ring on the hand he used to slap her, and the slap resulted in a "huge" bruise. She stated that when he raped her it "hurt." A few hours after the rape, she noticed "blood all over [her] panties [,]" and upon informing the [Petitioner] of this, he told her to throw the underwear behind the washing machine. The [Petitioner] later retrieved the panties and showed them to the victim's mother, who confronted her with them. The victim told her mother that she thought she had started her period and "freaked out so [she] throwed [sic] it behind the washer." She also told her mom that she got the bruise on her face when she was playing basketball with her sister and her sister hit her in the face

2

with the ball.

The victim recounted that one afternoon, she was reading a Harry Potter book on her bed, when the [Petitioner] came into her room. He "grabbed the book" from her and "told [her] to take off [her] clothes and get on [her] hands and knees." According to the victim, the [Petitioner] had previously tried to anally rape her but stopped because she started screaming and her mother was due home. Despite this fact, she complied with the [Petitioner's] demands to get on her hands and knees this time because she was afraid of him. The [Petitioner] then stuck "his penis up [her] butt," which she stated "hurt really bad." During the ordeal, the [Petitioner] instructed her to watch out the window for her mother's return from her neighbor's house. She tried to get away, but the [Petitioner] overpowered her. When asked about the measures she took to try to get away from the [Petitioner], she responded: "I would push away, and he would grab my arms and just lock on. And sometimes he would grab my hair or he would slap me or anything that I tried to get away, but he wouldn't let me." After anally penetrating her on this occasion, he turned her over, "[p]ut the white stuff on [her] bed[,]" and instructed her on "rule number one." He then "wiped it off with the cover[,]" put his pants back on, and "acted like nothing ever happened." Following this rape, she could not go to the bathroom without severe pain for a period of time.

Next, the victim recalled an incident when, just after getting a new television satellite, she was lying on the sofa eating and watching the children's cartoon "SpongeBob SquarePants" on the television. According to the victim, it was approximately 7:10 a.m. on a weekend morning, and her mother and sister were still asleep. The [Petitioner] came into the living room in his "orange and white Tennessee pajamas" and said they needed to hurry before the victim's mother woke up. She said, "What are you talking about," and he said, "You'll see." He then took off the victim's pants, spread her legs open, and "started penetrating [her.]" The [Petitioner] put his hands on either side of her neck during this encounter. She did not fight him because she was afraid of him by this time as he had already hit her in the face and "pulled [her] hair and everything, so [she] learned not to do anything."

The victim testified of another anal rape that took place in the [Petitioner] and her mother's bedroom when she was looking at some of her dead grandmother's pictures. The [Petitioner] came in and took the pictures from her, telling her she was "done[.]" The [Petitioner] then

removed their clothes. He then "bent [the victim] over at the foot of their bed, and he started putting his penis in [her] butt." Although no one else was home, she started screaming and crying. The victim said that on this occasion, she fought with the [Petitioner], trying to get away from him; however, the [Petitioner] pulled her hair and backhanded her with his ring hand. When he finished, "he had white stuff all over the bed" and again informed her of "rule number one." The victim stated that the [Petitioner] never "put anything on his penis . . . [t]o prevent her hurting[,]" and after this rape, it hurt when she walked for two or three weeks.

The victim relayed that on yet another occasion, when she and the [Petitioner] were home alone after school, the [Petitioner] taped her to his bed with black electrical tape "with white letters and numbers on it[.]" She was naked lying on her back; the tape was wrapped around her waist, and her arms were taped diagonally to the corners of the bed. The tape came from a "junk drawer" in the kitchen. The victim opined that the tape was from her neighbor's, Daisy Leib's, move because Ms. Leib used the same kind of tape to pack her belongings; Daisy "was supposed to be out by April 12th, but she kept moving her stuff." According to the victim, this episode "was actually the one time [the Petitioner] had actually had white stuff in [her] and then it also went onto the bed." The victim claimed that, when the [Petitioner] went to untie her, he ripped the tape off of her arms, removing hair. The [Petitioner] again threatened her with "rule number one." After her mother noticed that hair was missing from her arms, she told her mother that she and her sister had been playing a game.

The victim reported another rape that took place five or six days after her birthday. This rape occurred on a school day in the [Petitioner] and her mother's bedroom.

The victim testified that another rape took place while she recovered from a burn injury suffered in a motorcycle accident. She was out of school due to her injury. She was lying on the couch, and the [Petitioner] pulled her shorts down over the burn on her leg, causing her to cry. When she cried, the [Petitioner] slapped her on the face before pulling her legs apart and penetrating her. It hurt when "he was going up and down" because "he would land on" her injured leg.

The victim claimed that another sexual encounter occurred when the [Petitioner] showed her a pornographic magazine he kept in his bedroom. He displayed the magazine to her and started "jacking off." He then made

4

the victim lie down on the bed even though she did not want to, and he "started rubbing on [her]" while having her look at the magazine. He touched her vagina with his hand, "just rubbing all of [her]." "White stuff" came out and he put it on her stomach. She testified that the [Petitioner] showed her this magazine on at least three separate occasions; one picture included a girl with "her legs up, and the guy's penis was just laying on her."

The victim testified that at times, the [Petitioner] took pictures of her with a disposable camera and with a digital camera. During these encounters, the [Petitioner] would often force her to look at the pornographic magazine. Some pictures were of the victim naked, and some included the [Petitioner] putting his penis on her vagina like the picture in the magazine. "Sometimes[,]" he also photographed touching her vagina with his mouth. She complied with his requests because she "didn't want to get beat." According to the victim, the [Petitioner] kept these pictures in a box under his bed.

The victim testified that she kept a journal of the rapes because her counselor had instructed her to write things down. She kept that journal behind a loose board in her bedroom closet.

The victim admitted that she burned their mobile home down. The night before the fire, she packed clothes for her family so that they could leave quickly once the fire started; she put the clothes in a backpack and a suitcase and placed them in her closet so she "could just grab it and get [her sister] out of the house." She stated that she set fire to the mobile home because she "was afraid that if [she] . . . told [her] mom, she wouldn't believe [her], she would end up going back to [the Petitioner] and it would have just happened over again, and [she] had to get away from it." Initially, her mother did not believe her about the abuse, but she changed her mind when the victim asked to be taken to a doctor.

The victim recounted that she had been sexually abused by her father when she was five years old. She did not remember any details from her father's abuse, but she knew he put his penis into her. He did not have anal sex with her or tape her to a bed. She did not recall her father ever showing her any pornographic material. Her father did not hit her or take pictures of her. She did not bleed or have blood in her underwear after the abuse by her father.

5

On cross-examination, the victim was asked about her interview with Captain Penny Baker following the abuse by her father. She did not recall most of the details of the interview; she did not remember describing the term "jacking off"; discussing her cousin Victoria; or telling about her father making her "watch a really nasty movie with a woman sucking a man's d--k and a woman having sex with a boy[.]" She acknowledged that she made a similar allegation against the [Petitioner], telling investigators that the [Petitioner] made her watch pornographic videos "involving little girls performing oral sex on a grown man[.]"

The victim acknowledged that she initially lied to her mother and the police about her role in burning the mobile home. She admitted to fabricating a story about receiving a death threat prior to burning down the trailer herself. She also testified that her neighbor's trailer was burned down about one week before she burned down her own trailer. She explained that she saw three individuals at the neighbor's house with lighters "messing with it[.]" They went behind the house, "[a]nd as soon as they left, there was smoke coming from the house." She tried to take pictures of the individuals with a disposable camera but was not certain "if there was actually pictures on the camera." However, she admitted that she did not actually witness the three individuals set fire to Ms. Leib's trailer. She recalled that Ms. Leib said, in front of her, her mother, and the [Petitioner], that once she moved out of the trailer, she was going to pay the [Petitioner] or her boyfriend to burn down the residence, which was in foreclosure. She denied burning her hand the day Daisy Leib's trailer burned and insisted that the burn on her hand happened when she burned down her own mobile home.

The victim also admitted that she had gotten into trouble in school for lying. She told a boy at school, that in the event he ever hurt her, her mother said she was "not afraid to go back to prison." However, her mother had never been to prison. The victim explained that it was a joke that she heard her mother repeat from a television program. The boy reported that she had threatened to kill him with a gun, and she received detention for two weeks.

When asked if her mother was open about sexual matters, the victim replied that "[i]t depends on what it was. . . . [I]f I had questions, she would answer them because I was becoming a teenager, but she never like exposed it to me." The victim further stated that she never saw her mother have sex with any of her boyfriends and that her mother did not describe

oral sex or masturbation to her.

*Nance*, 393 S.W.3d 215-18.  The trial court imposed an eighteen-year sentence for each rape of a child conviction, with service at 100%, and a ten-year sentence for the aggravated sexual battery conviction, with service at 30% as a Range I, standard offender.  The trial court ordered that counts one and two for rape of a child be served concurrently with each other and, likewise, for counts three and four and counts five and six.  The court ordered consecutive service of each pair of eighteen-year sentences, followed by consecutive service of the ten-year sentence, resulting in a total effective sentence of sixty-four years in the Department of Correction.  *Id.* at 222.

## B. Post-Conviction Proceedings

The Petitioner filed a petition for post-conviction relief alleging that he had received the ineffective assistance of counsel on numerous bases; relevant to this appeal, he alleged that trial counsel ("Counsel") was ineffective when he cross-examined the victim.

The following evidence was presented at a hearing on the petition:  The Petitioner testified that he had been in a romantic relationship with the victim's mother and that they lived together in 2008.  On May 29, 2008, their shared mobile home burned down, and the Petitioner was arrested on June 12, 2008, for raping the victim.  The Petitioner's parents retained an attorney ("Counsel") who visited the Petitioner in jail three or four times for thirty-minute periods.  Counsel encouraged the Petitioner to enter a guilty plea. At the Petitioner's preliminary hearing in July 2008, Counsel communicated to the Petitioner the State's plea offer of thirteen years, which the Petitioner rejected.  The Petitioner's parents hired a private investigator.

While released on bond and awaiting his trial, the Petitioner resumed work as a truck driver.  He met with Counsel three or four more times, and they spoke a lot on the phone.  The Petitioner recalled returning to the area twice before his trial.  He did not go over the discovery file with Counsel or listen to any of the recordings.  The Petitioner and Counsel met for an hour maximum at each meeting.  Counsel and the investigator spoke frequently.

Counsel represented the Petitioner through the motion for new trial hearing, following which the Petitioner terminated their professional relationship.  The Petitioner subsequently was represented by four more attorneys throughout his multiple post-conviction filings, which led to this hearing.

On cross-examination, the Petitioner agreed that he had complaints about all of the

7

attorneys who represented him after Counsel. He agreed that Counsel came to visit him in jail. He also agreed that he might have missed appointments with Counsel prior to trial while he was working. The Petitioner agreed that his work schedule was part of the reason he and Counsel did not spend enough time working together prior to trial.

The Petitioner stated that his contention was that the victim's mother had concocted a conspiracy against him and that Counsel did not want to present that theory to the jury.

The Petitioner answered questions posed by the post-conviction court and testified that he did not see his discovery file until he was in prison. He testified that he filed a complaint with the Board of Professional Responsibility against Counsel. The Petitioner testified that Counsel failed to procure the victim's school attendance records or the Petitioner's work records to show when the two individuals would have been apart. He agreed that his "chief complaint" with regards to Counsel's performance was that Counsel did not impeach the victim properly.

The Petitioner testified that, when he was able to review discovery, he watched a video recording of the victim's forensic interview during which the victim stated that the Petitioner wielded a butcher knife during one of the rapes. The victim testified at the preliminary hearing that the Petitioner had not utilized any weapons.

Counsel testified that he represented the Petitioner; the Petitioner's parents retained an investigator after his arrest. Counsel and the investigator met with the Petitioner five to ten times at the jail; two to three times after the Petitioner's arrest but prior to the preliminary hearing. The time between the preliminary hearing and trial was approximately thirteen months, and the Petitioner was in jail for some of that time period. After the Petitioner posted bond, Counsel made three standing appointments with the Petitioner when he was scheduled to be in town and Counsel was not in court so that they could review the discovery file together. The Petitioner "never showed up." Counsel said that it was difficult to contact the Petitioner, and he did not think that the Petitioner would show up for trial. Counsel maintained that he did, however, review the discovery material with the Petitioner, including the video recording of the victim's forensic interview. Counsel testified that he "missed" the victim's statement in the interview about the Petitioner using a knife, which was inconsistent with her preliminary hearing testimony. Counsel stated that it was a "mistake" not to watch the interview more than once but that he felt his time was better spent preparing for other matters related to trial.

Counsel testified that the victim's inconsistent statement and testimony about the butcher knife was an important piece of evidence. Counsel did not intend to play the interview at trial when the butcher knife was not mentioned. Counsel recalled that the

victim testified at trial that the Petitioner had taped her to a bed during one of the rapes on a day when she did not have school; she described where on her body he had taped her and what she was wearing that day. This testimony was inconsistent with the victim's forensic interview statement. Counsel agreed that he did not have the forensic interview recording at the preliminary hearing so he was unable to impeach the victim. Counsel agreed that the victim testified about the taping incident at trial and made statements inconsistent with both her forensic interview and preliminary hearing testimony. Counsel generally agreed that had he watched the forensic interview a second time before trial, those inconsistencies would have been brought to his attention, so he could impeach the victim. Counsel agreed that, in the forensic interview, the victim stated that the Petitioner had taped her head to the bed and then ripped her hair; she did not testify to this event at trial.

Regarding more of the victim's inconsistencies, Counsel agreed that the victim stated in the forensic interview that a rape on a certain day occurred at 6:30 a.m.; she testified at the preliminary hearing that the rape occurred at noon. At trial, the victim testified that the Petitioner ejaculated inside her; she did not mention that fact in her forensic interview or at the preliminary hearing. Counsel recalled that the victim had inconsistencies throughout her statements and testimony, and at times her statements directly contradicted each other. Counsel testified that, had he brought up these subjects on cross-examination, he would have been forced to introduce the victim's forensic statement at trial which he did not want to do; the interview showed the victim cowering in a dark room, obviously scared and upset, an image he did not want to have in the jurors' minds.

Counsel testified that he was aware that the victim had made past accusations of sexual misconduct against the victim's mother's ex-husband. He agreed that records from the Department of Children's Services ("DCS"), contained in discovery, indicated that the allegations were unfounded and that the victim was confusing her accusation with past attempts at sexual contact made by the victim's father. Counsel testified that he did not bring up at trial the victim's prior accusations because the DCS records indicated that the victim was confused, as opposed to lying, so he did not think that he could impeach her with that information. Counsel agreed that he could have brought in this information through Tennessee Rule of Evidence 608 to attack the victim's credibility.

Counsel testified that the Petitioner wanted to show that the victim's mother had coached the victim and the victim's sister (who also accused the Petitioner of rape) into making their accusations. Counsel did not believe that the victim's mother had done so nor did he think she would have instigated the investigative process that had ensued. Counsel also recalled a detective telling him that the victim's mother initially had not believed the victim's accusations against the Petitioner, which indicated to him that the

victim's mother was not fabricating the rapes.

On cross-examination, Counsel stated he had experience with child sex abuse cases in multiple roles and that inconsistencies in children's accounts of their abuse were common, as were mistakes regarding time periods and dates, weather and other events. He agreed that the victim was able to describe the rapes in detail in terms of where in the home they occurred, as well as where her other family members were and on what furniture she was raped. He agreed that the victim described, on certain occasions, what was playing on television or what the Petitioner was wearing. All of those details in conjunction with the victim's physical description of the rapes made her testimony more credible in the eyes of the jury. He testified that this particular victim provided more detail than other minor victims. Counsel reiterated that he was aware of the inconsistencies between the victim's trial testimony and her prior statements; he stated, however, that he never intended to play the victim's forensic interview at trial because he felt it was a risky thing to show the jury.

Concerning other subjects about which he did not cross-examine the victim, Counsel testified that the trial court limited his cross-examination in some regards and in others he lacked an avenue for introducing the evidence, such as the victim's prior accusation against another abuser. Counsel stated that he generally did not challenge the victim about her testimony or inconsistent statements when it would not have served a purpose in furtherance of proving the Petitioner's innocence.

Counsel testified that he arranged for a medical expert to testify on the Petitioner's behalf to rebut the testimony that the victim's physical examination had revealed the presence of injury. He stated that his expert testified very credibly and he thought she helped the Petitioner's case.

On redirect-examination, Counsel stated that he did not contact the person to whom the victim initially disclosed the rapes because he did not have the person's contact information; he agreed that it would have been a good thing to try and find this person but said he thought nothing would come of it. Counsel stated that during her trial testimony, the victim was calm and convincing. Counsel testified that he had tested the victim's credibility on the witness stand, although employing the forensic interview could have provided additional challenges.

The victim testified that she could remember the major details of her trial testimony but possibly not all of the minor details. When asked about the Petitioner's using a knife during one of the rapes, the victim stated that she could recall something with a blade but not how or in what manner it was used. She did not remember any of her prior statements other than her trial testimony. The victim recalled the Petitioner

taking nude photographs of her on a digital camera and then showing them to the victim. The victim testified that she kept a journal in a red or green spiral notebook of all the times the Petitioner had touched or penetrated her. The victim recalled that she burnt down the trailer she lived in with the Petitioner, with the notebook inside, in an attempt to get the Petitioner out of her life. The victim stated that any inconsistencies between her statements or testimony were present because she was a scared child trying to get out her story and often the story came out in pieces. She said that any statement she made about no weapon being used was a mistake.

The post-conviction court issued an order denying the Petitioner relief and stating the following:

> The question today is the *Strickland* standard. And although her testimony might buttress [Counsel's] performance, I think [Counsel] has owned any particular mistake he made. The question becomes is that mistake such that would create a change in the outcome of the trial; I think not. I don't think the [P]etitioner has established that there was ineffective assistance of counsel that led to prejudice to the point that a case would be - - or a different verdict would have been returned. The witnesses that have testified here today, the [P]etitioner has been somewhat impeached. Furthermore, it simply fails to state a level of incompetence or ineffectiveness on [Counsel] that would rise to the level of any relief. [Counsel] owned whatever -- whatever error and more broadly, he adequately explained why he chose not to attack the lady that testified here today. It was a strategic decision well thought out. He mentioned, you know, [the Assistant District Attorney General who prosecuted the case] having many, many years of experience. Well, [Counsel] probably has as much experience in that arena than anybody in the Courtroom at that time. He knew that he was operating in perilous water by attacking a young witness. Those -- furthermore, he raised the proper motions. I mean, he didn't get the rulings that he was looking for, but certainly, no one begrudges him for raising those issues. There were some hard rulings. And I can -- I specifically remember [Counsel] was aggressive in this trial. He forcefully tried to get in the My Space information to the jury, and I -- you know, I respectfully disagreed and ruled against him, but he was on his game, and he fought very hard for [the Petitioner] at the time. It probably wasn't a perfect trial, I've never seen a perfect trial, but he did his job, and I'm gonna find that there has been no showing of any actual prejudice that would have changed the verdict in this case.

It is from this judgment that the Petitioner now appeals.

11

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition because he received the ineffective assistance of counsel. He contends that Counsel was ineffective in multiple aspects of his cross-examination of the victim. The State responds that Counsel made a sound, tactical decision not to vigorously attack the minor victim on the witness stand in order not to draw the jury's attention to more of the details of the assaults, such as the Petitioner's use of the butcher knife or tape. Additionally, the State contends that the Petitioner has failed to show that he was prejudiced by Counsel's decision to cross-examine the victim in the manner he did. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2018). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2018). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a

breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

Specifically, the Petitioner contends that Counsel was ineffective for failing to challenge the victim during cross-examination regarding the following testimony: (1) the butcher knife testimony; (2) the testimony about the Petitioner binding the victim or tying her to the bed with tape; (3) the "blinds" incident; (4) the "smothering" incident; (5) additional assaults that the victim testified the Petitioner had committed towards the victim; and (6) the photographs taken by the Petitioner. The Petitioner argues that, as his convictions relied on the victim's credibility, and as no physical evidence was presented, Counsel's failure to adequately cross-examine the victim on these matters and challenge her credibility prejudiced him significantly. The Petitioner cites *Jay Dee Garrity v. State*, M2016-01463-CCA-R3-PC, 2018 WL 1691296, at *1 (Tenn. Crim. App., at Nashville, Feb. 22, 2018), *no Tenn. R. App. P. 11*, to support his contention that he is entitled to post-conviction relief based upon Counsel's allegedly improper cross-examination.

The evidence does not preponderate against the post-conviction court's findings. In *Jay Dee Garrity*, this court recently granted post-conviction relief to a petitioner based upon his counsel's failure to adequately cross-examine witnesses. 2018 WL 1691296, at *13-14. In that instance, the petitioner's trial counsel failed to cross-examine two witnesses at all and failed to cross-examine two additional witnesses about inconsistencies in their statements. *Id.* We find *Jay Dee Garrity* distinguishable from this case. Here, Counsel cross-examined the victim on multiple aspects of her testimony. Having experience with minor victims of sexual abuse, Counsel testified that he was aware of the prevalence of inconsistencies in a minor victim's memory and that the victim in this case testified in more detail than was common. While he conceded during the post-conviction hearing that he made a mistake not to challenge the victim about her inconsistent statement with regard to the butcher knife, he also stated that he elected not to challenge her too harshly given her age and the fact that juries do not take kindly to attacks on children. Counsel also recalled that the victim "did well" on the witness stand and provided credible details. Counsel felt that challenging her on other minor details would not help prove the Petitioner's innocence. The victim testified at the post-conviction hearing that she remembered the larger details of the rapes, including that a weapon had been used, although what kind or in what capacity she could not remember. She stated that any inconsistent statements she made were due to the fact that she was a scared child trying to get her story out in pieces. It can be reasonably assumed that she would have testified similarly at trial had Counsel challenged her on such inconsistencies, further supporting his theory that attacking her credibility would not have benefitted the Petitioner in the eyes of the jury or changed the outcome of the trial. Such strategic or tactical decisions are given deference on appeal if the choices are informed and based upon adequate preparation. *See Goad*, 938 S.W.2d at 369; *see also Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). While Counsel's cross-examination of the victim was not perfect, as he conceded, we conclude that it fell within the wide range of "reasonable

14

professional assistance," *Burns*, 6 S.W.3d at 462, and this court will not conclude, in hindsight, that other decisions should have been made. The Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude the post-conviction court properly denied the Petitioner's petition for post-conviction relief. In accordance with the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE