IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
February 3, 2026 Session

**STATE OF TENNESSEE v. VICTOR GORDON**

**Appeal from the Criminal Court for Shelby County**
**No. 2001648    James Jones, Jr., Judge**

———————————

**No. W2025-00506-CCA-R3-CD**

———————————

The Defendant, Victor Gordon, appeals from his convictions for rape of a child and aggravated sexual battery.  Specifically, he argues the evidence was insufficient to support his conviction for rape of a child because the State failed to present evidence of sexual penetration.  He further contends that he is entitled to plain error relief as to both convictions on the basis that the trial court failed to make the required statutory findings for the admission of the victims' forensic interviews pursuant to Tennessee Code Annotated section 24-7-123.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which MATTHEW J. WILSON and STEVEN W. SWORD, JJ., joined.

Joseph McClusky (on appeal and at motion for new trial), and Larry Fitzgerald (at trial), Memphis, Tennessee, for the appellant, Victor Gordon.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Steve Mulroy, District Attorney General; and Lessie Rainey and Devin Dennis, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.     FACTUAL AND PROCEDURAL HISTORY

This case arises from the Defendant's alleged sexual abuse of R.W. and A.W.,[1] who were the grandchildren of the Defendant's girlfriend, during a weekend visit with their grandmother in September of 2019.  For this conduct, the Defendant was indicted for rape of a child involving A.W. and aggravated sexual battery involving R.W. (collectively, "the victims").  *See* Tenn. Code Ann. §§ 39-13-504, -522.

After the victims disclosed the abuse, they each participated in separate forensic interviews at the Memphis Child Advocacy Center ("Child Advocacy Center") on September 18, 2019, a little over a week after the alleged incidents happened.  Letitia Cole, a forensic interviewer at the Child Advocacy Center, conducted the interviews.

During R.W.'s forensic interview, R.W. confirmed she was seven years old in September of 2019.  When asked why she was at the Child Advocacy Center, R.W. stated, "a boy named Victor" was being "nasty" to her and her sister, A.W.  R.W. explained that "Victor" was a grown man who lived with R.W.'s grandmother.  When asked to explain what "nasty" things Victor had done, R.W. said Victor had "pat[ted]" her on the "crotch" once while they were inside of a camper next to her grandmother's house.  She explained that "crotch" meant "where your pee comes out."  She confirmed that she had her clothes on when he did this and that he patted her on the "outside" of her clothes.  She told him to stop, but he continued.  While R.W.'s grandmother was not inside the camper when this happened, R.W. said that A.W. had witnessed it.  R.W. confirmed that no one else had done anything like this to her except for Victor.

R.W. then stated that "[A.W.] and Victor [were] really nasty" and explained that Victor had "kiss[ed]" A.W. on the "crotch" while they were inside of the camper.  When this happened, R.W. was sitting in the front seat of the camper, and A.W. was in the back of the camper with Victor.  R.W. saw A.W.'s clothes pulled down to her knees and saw Victor kissing A.W.'s "crotch."  R.W. "knew she saw him do that to [A.W.]," and she "really" wanted to slap Victor.  R.W. said this was not the only time Victor had done something similar.  She had previously seen him touch her grandmother's "boobs," which he now also did to A.W., and was "always kissing" A.W.'s lips.  She confirmed that Victor had never asked R.W. to touch any part of his body but stated that he had shown her parts of his body.  She referenced an incident in a hot tub at their grandmother's house where Victor had shown her and A.W. "what boys pee out of."

---

[1] It is the policy of this court to refer to minor children and victims of sexual abuse by their initials.

During A.W.'s forensic interview, she confirmed that she was five years old in September of 2019. She then, without prompting, exclaimed, "Victor kissed me on my crotch." When asked to explain, A.W. said that "Victor" was her "grandpa" and that the camper was close to the house her grandmother and Victor shared. While in the camper, Victor had pulled down her pants, kissed her on the "crotch," pulled her pants back up, and kissed her on the lips. A.W. was shown a drawing of the female anatomy and asked to point to where Victor had kissed her. A.W. pointed to the vaginal area, and Ms. Cole circled where A.W. had pointed on the diagram. A.W. also disclosed that Victor had touched her "boobs" with his hand on the "inside" of her clothes. She noted that R.W. had seen Victor doing these things to her and then stated that she had once seen Victor pat R.W. on the crotch. While Victor had not asked A.W. to touch any part of his body, she explained that he had shown her and R.W. parts of his body. While in a hot tub, he had shown her and R.W. his "wiener."

On April 11, 2022, the State moved the trial court for a pretrial hearing pursuant to Tennessee Code Annotated section 24-7-123 to determine the admissibility of the victims' forensic interviews. In its motion, the State asserted that the victims were interviewed at the Child Advocacy Center by a forensic interviewer and that the victims would testify that the recordings were true and accurate.

Immediately prior to trial on February 27, 2023, the State informed the trial court that the Defendant would stipulate to the admissibility of the victims' forensic interview recordings, in that the recordings met the statutory requirements of Code section 24-7-123 and that a pretrial hearing on that issue would not be necessary. The State noted its intention to call the forensic interviewer as a witness and play the recordings in its case-in-chief. The trial court requested that a written stipulation be entered as to this agreement. Prior to the jury being sworn, the parties submitted to the trial court a signed stipulation as to the following facts:

> 1. The interviews were videotaped, were conducted by a forensic interviewer at the Memphis Child Advocacy Center, and contain statements made by [R.W.] and [A.W.], both children under the age of 13, describing acts of sexual abuse by the [D]efendant[ ].
>
> 2. The Memphis Child Advocacy Center meets the statutory requirements of T.C.A. 9-4-213;

3. Considering all of the factors in T.C.A. 24-7-123, the forensic interview possesses the particularized guarantees of trustworthiness provided for in T.C.A. 24-7-123(b)(2)(A-K);

4. Forensic Interviewer Letitia Cole meets the requirements of T.C.A. 24-7-123(b)(3)(A-H);

5. The offered video recording is a true and correct recording of the events contained in the video recording;

6. The State submits that [R.W. and A.W.] will be available to testify at trial and be subject to cross-examination by the Defense; and [R.W. and A.W.] know the difference between right and wrong, and between telling the truth and telling a lie, and [R.W. and A.W.] will state that their answers to the questions on the forensic interview were truthful.

7. The forensic interview video recording shall not be subject to further disclosure or dissemination; the recording shall not become a public record in any legal proceeding; and the recording shall be sealed and preserved in this Court's record at the conclusion of the trial in this matter.

All of which is hereby ordered, adjudged and decreed to be the order of this Court.

The trial court accepted the stipulation, signed it, and entered it for identification purposes prior to the victims' testifying.

At trial, C.W.,[2] the mother of R.W. and A.W., testified that the victims' grandmother began dating the Defendant sometime in 2017, and the two had moved in together on Monroe Street in Memphis by the end of that same year. The victims used to visit their grandmother and, at first, appeared to like spending time there. However, this changed in September of 2019. On Friday, September 8, 2019, C.W. dropped the victims off with their grandmother and the Defendant to stay the weekend. That Sunday, September 10, C.W. and the victims' father picked up the victims and went to "Aunt Jean's" house. While at Aunt Jean's house, C.W. was called into a room with the victims. The victims then told C.W. that the Defendant had "patted [R.W.] on her private area" and had "kissed [A.W.] on her bare private area" while in the camper behind their grandmother's house. C.W.

---

[2] We use initials for this witness to further protect the identity of the minor victims.

notified law enforcement of the victims' disclosures and took the victims to the hospital and to the Child Advocacy Center.

During R.W.'s direct examination, she initially did not respond to the prosecutor's questioning. After the prosecutor told R.W. that she would ask R.W. only "a few questions[,]" R.W. then stated her name and provided that she was eleven years old at the time of trial. R.W. confirmed that she recalled going to the Child Advocacy Center and talking "to a nice lady about some bad things that [had] happened to [her.]" She confirmed that she had told the truth during the interview, had since watched the recording of the interview, and that everything in the recording was true. She identified the Defendant in the courtroom as the person who "did those things to [her ] that [she] talked about in the video[.]"

During cross-examination, R.W. identified the Defendant as her grandmother's boyfriend. She confirmed that she and her sister, A.W., used to stay with their grandmother and the Defendant, but no longer did so. When R.W. was asked whether any incident had happened in the hot tub at her grandmother's house, R.W. responded, "I hate talking about this." R.W. then expressed that she needed a "a minute," and when questioning resumed, she commented, "I want to be out of here." R.W. then confirmed that the Defendant had a camper near his home, and during one weekend visit, the Defendant had taken her and A.W. to explore the camper. Their grandmother was not with them. While inside the camper, R.W. sat in the driver's seat, and the Defendant was in the back of the camper with A.W. When R.W. looked in the rearview mirror, she saw A.W. on the bed with her pants pulled down. The Defendant was not "on top" of A.W. but was "crouching down" and "licking" A.W. When A.W. and R.W. locked eyes, A.W. "gave [R.W.] that one stare" and R.W. "just knew . . . it was happening." R.W. then left the camper. She disclosed what had happened after she and A.W. left their grandmother's house.

A.W. testified that she was eight years old at the time of trial. She remembered that she and her sister R.W. used to visit their grandmother's house and that the Defendant lived with their grandmother. She remembered that she and R.W. would swim in the hot tub at their grandmother's house and that, at times, the Defendant would also be in the hot tub with them. A.W. confirmed that "something bad happen[ed] in the hot tub" and explained that the Defendant had once "pulled his pants down and [she and R.W.] saw it." When asked, A.W. said "it" meant the Defendant's "[m]iddle." She then confirmed that "his middle part" meant the Defendant's penis.

A.W. also recalled that a camper was located in the backyard of their grandmother's house and that she, R.W., and the Defendant went inside of the camper during her and

R.W.'s last visit there. While she was in the back of the camper near the bed, the Defendant "kissed [her] lips." Her pants were then removed, and the Defendant "kissed [her] middle." A.W. confirmed that "middle" meant her vagina. When asked if the Defendant's lips touched her "bare skin" or clothing, A.W. said that the Defendant's lips touched her clothing at "[t]he top of [her] pants[,]" although she again confirmed that her pants were down. A.W. also stated that the Defendant touched her "boobs" underneath her clothes when he "kissed [her] middle part[.]" During cross-examination, defense counsel asked, "And you said he kissed you on your stomach?[,]" to which A.W. responded that the Defendant had "pulled down" her pants and kissed her "middle." She confirmed that during this incident, R.W. was at the front of the camper, and when she looked up toward R.W., she saw R.W. looking at her through the rearview mirror. R.W. then left the camper.

Once A.W. and R.W. were picked up from their grandmother's house and were at their Aunt Jean's house, A.W. told her mother what the Defendant had done. Her mother called law enforcement and took her and R.W. to the hospital. She also recalled going to the Child Advocacy Center and talking to "a nice lady." She confirmed that she had watched the recording of her interview and that she had told the truth during the interview. She confirmed that she knew what it meant to tell the truth, and if she did not tell the truth, she "might get a who[o]ping." She also confirmed that she had been truthful during her testimony.

Ms. Cole testified that she had been employed with the Child Advocacy Center for twelve years. As a forensic interviewer, her role was to conduct interviews in a neutral environment with children who were possible victims of abuse. She then detailed the type of training she had received for her role as a forensic interviewer. She confirmed that she conducted both R.W.'s and A.W.'s forensic interviews on September 18, 2019. Both interviews were entered as exhibits and played for the jury. The diagram marked during A.W.'s forensic interview was also entered as an exhibit.

Doctor Lauren Burge, an expert in the field of child abuse pediatrics, testified that she was employed with Le Bonheur Children's Hospital. She explained that she worked as a consultant, meaning that when a child is admitted to the hospital, another doctor sees the child, but if a concern regarding abuse arises, the doctor contacts and consults with her. As such, a part of her job entails reviewing medical records of children that she did not personally examine and forming a medical opinion based on those records. She confirmed that, while she did not conduct the physical examinations of the victims, she had reviewed the medical records of both R.W. and A.W. from when they were admitted to the hospital. These records were entered as exhibits. R.W.'s medical records provided that R.W. had reported sexual abuse from her grandmother's boyfriend who had "touched her on her

genitalia over her clothes." A.W.'s medical records reflected that A.W. had reported that her "grandmother's boyfriend touche[d] her inappropriately. . . . [and] kissed her on her genitalia underneath her clothes. . . . [and had] touched her on her breast over her clothes." Dr. Burge noted that she was not present when the report was made and could not confirm whether the disclosures in the medical records were provided by R.W. and A.W. or by the caregiver who accompanied them to the hospital. No evidence of physical trauma was reported for either R.W. or A.W., although Dr. Burge confirmed that she did not expect any physical evidence to be present based on the allegations.

Ronald Polk with the Memphis Police Department testified that in 2019, he was assigned to the Special Victim's Unit on the "Sex Crimes juvenile abuse side." He assisted with the investigation into the allegations against the Defendant. On February 27, 2020, the Defendant came to the station and gave a statement, a recording of which was entered as an exhibit. On the recording, the Defendant noted he was at the police station over allegations of sexual abuse toward R.W. and A.W. He said that he and the victims had a good relationship, that they jumped all over him, and that the victims were affectionate. He commented that, when the victims played with lipstick, they would "put kisses" all over him. He noted that, although R.W. tried to give him "smooches" on the lips "all the time," he never kissed her on the lips on purpose and would have to "shove" her away. A.W., however, only kissed him on the cheeks. He recalled that he and the victims used to play "family" out in the camper near his house that he shared with the victims' grandmother. He stated this camper was not technically on his property but was only about fifty feet from his house. During this "family" game, R.W. played the "momma," and while he pretended to drive the camper, he claimed that he did not know which character he was in the game.

The Defendant then noted that he, the victims, and the victims' grandmother spent time in the hot tub at his house. He detailed incidents where the victims would "drag" him back into the hot tub when he tried to leave, with them once tearing a hole in his swimming trunks. One time, they took off their swimming clothes "spontaneously" and began running around. He told them to put their clothes back on before they "got him in trouble." He then mentioned that, while in the hot tub, the victims would "grab" him and that R.W. was "always groping" him. When asked to explain what he meant by this, he stated that R.W. would go under the water with her googles and, without his knowledge, would reach out and grab his penis and testicles and squeeze. The Defendant joked that he had told the victims' grandmother that he needed "a cup," and although he told the victims to stop, "telling them to stop [was] like telling them to go for it." He stated that he weighed about 180 pounds and agreed that an average seven-year-old weighs approximately sixty-five pounds.

The State rested, and the Defendant called six witnesses in his defense. Five of the witnesses testified similarly that they were friends or business acquaintances of the Defendant and had known the Defendant for over twenty years. Each stated that they would not have expected the Defendant to do what was alleged in the allegations but acknowledged that they had never seen the Defendant around the victims. Kathy Brooks, the Defendant's aunt, testified that she had seen the Defendant around the victims and the interactions were "[j]ust kind of fun loving." She recalled the victims would play around and sit on the Defendant's lap at times; it seemed like a "normal relationship[.]" Ms. Brooks did not believe the Defendant would do what was alleged in the allegations. She explained that the Defendant had wanted children of his own and had "always been really good with the children that he was around." She acknowledged that the times she was there with the victims, the victims' parents were also present at the Defendant's house. She confirmed that she never saw the victims when they were in the hot tub and acknowledged that she had heard the Defendant's joke about needing a "cup," which she did not find appropriate.

At the close of proof, for the rape of a child count, the State elected the time A.W. described in her forensic interview when the Defendant had "kissed" her "crotch" in the back of the camper and pulled her pants back up afterwards. For the aggravated sexual battery count, the State elected the incident R.W. described in her forensic interview when the Defendant had patted her "crotch" outside of her clothes while she was sitting in the front seat of the camper. During closing argument, defense counsel asserted that the State had failed to prove the element of penetration for the rape of a child count. He contended that while both victims noted that the Defendant had pulled down A.W.'s pants, neither specified that A.W.'s underwear had been removed for the Defendant to perform cunnilingus on her. Defense counsel noted that if A.W.'s underwear had been removed, such a fact would "certainly have been said through her forensic interview" if true.

The jury found the Defendant guilty as charged. He was then sentenced to an effective thirty-year sentence at one hundred percent to be served in the Tennessee Department of Correction. The Defendant hired a new attorney, who filed a motion for new trial on the Defendant's behalf, raising issues with the sufficiency of the evidence and the trial court's failing to make the statutory findings for the forensic interview recordings' admission pursuant to Code section 24-7-123. The trial court denied the Defendant's motion and entered a written order to that effect on March 14, 2025.[3]

This timely appeal followed.

---

[3] The record on appeal does not include a transcript of the motion for new trial hearing.

## II.    ANALYSIS

### A.    Sufficiency of the Evidence

The Defendant argues that the evidence was insufficient to support his conviction for rape of a child, contending that the State failed to prove sexual penetration occurred. To this point, he alleges that A.W.'s testimony did not establish he performed cunnilingus on her because her testimony was that the Defendant's lips touched her clothing, not her "bare skin." The State responds that the evidence was sufficient to establish that the Defendant had oral contact with A.W.'s vagina based on A.W.'s trial testimony, forensic interview, multiple disclosures, and R.W.'s corroboration of the incident.

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id*. (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835.

At the time of the Defendant's offenses, rape of a child was defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code

Ann. § 39-13-522 (2018). Sexual penetration includes "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7). Cunnilingus means a sex act accomplished "by placing the mouth or tongue on or in the vagina of another." *See State v. Hoyt*, 928 S.W.2d 935, 942 (Tenn. Crim. App. 1995), *overruled on other grounds by Spicer v. State*, 12 S.W.3d 438, 447, 447 n.12 (Tenn. 2000). As such, oral contact with the female genitals is required, not oral penetration into the vagina. *See State v. Bardin*, No. W2017-02506-CCA-R3-CD, 2019 WL 458917, at *3 (Tenn. Crim. App. Feb. 5, 2019); *State v. Farr*, No. M2016-01216-CCA-R3-CD, 2017 WL 4280701, at *7 (Tenn. Crim. App. Sep. 26, 2017).

Here, the evidence established that, during A.W.'s forensic interview, the then five-year-old A.W. stated that, while in the camper, the Defendant pulled her pants down, "kissed [her] on [her] crotch," and then pulled her pants back up. When asked to indicate on a drawing of the female anatomy where the Defendant had kissed her, A.W. pointed to the vaginal area. At trial, while she stated once that the Defendant's lips touched her clothing at the "top of [her] pants[,]" she testified multiple times that her pants were pulled down during this incident and that the Defendant kissed her "middle." Throughout her testimony, A.W. confirmed that "middle" meant genitalia and, as to this specific incident, confirmed that her "middle" meant her vagina. We note that the victim's testimony alone is sufficient for a rational juror to conclude that the Defendant committed rape of a child. *See State v. Nance*, 393 S.W.3d 212, 230-31 (Tenn. Crim. App. 2012) (citing *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)).

Additionally, A.W.'s account was corroborated by R.W.'s forensic interview and trial testimony and by A.W.'s multiple disclosures to other third parties. In R.W.'s forensic interview, R.W. stated that she saw the Defendant "kiss[]" A.W. on "the crotch" while in the camper and explained that "crotch" meant "where your pee comes out." She noted that A.W.'s clothes were pulled down to her knees when the Defendant did this. At trial, R.W. testified similarly, recounting that, while she was sitting in front of the camper, she looked in the rearview mirror and saw A.W. on the bed with her pants pulled down. According to R.W., the Defendant was "crouching down" and "licking" A.W. During this time, R.W. locked eyes with A.W., A.W. gave R.W. "that one stare," and R.W. "knew it was happening." Furthermore, C.W. testified that the victims told her the Defendant had kissed A.W. on her "bare private area" while in the camper, and A.W.'s medical records reflected that her "grandmother's boyfriend . . . kissed her on her genitalia underneath her clothes."

From all this evidence, a jury could rationally infer that the Defendant performed cunnilingus on A.W. *See, e.g.*, *Hoyt*, 928 S.W.2d at 942-43 (holding that the evidence was sufficient to establish the defendant sexually penetrated the victim by performing cunnilingus on her when the victim testified that the defendant licked her "privates," meaning her vagina*); State v. Blanton*, No. M2020-00155-CCA-R3-CD, 2022 WL 904839, at *9 (Tenn. Crim. App. Mar. 29, 2022) (holding that the evidence was sufficient for a rape of a child conviction, despite the victim's inconsistent testimony, when her testimony viewed as whole established that sexual penetration occurred, and this account was corroborated by her statements given during her forensic interview); *State v. Parker*, No. 02C01-9306-CR-00130, 1994 WL 716272, at *2 (Tenn. Crim. App. Dec. 28, 1994 (holding that the evidence was sufficient for an aggravated rape conviction when the child victim's testimony contained some inconsistencies but was corroborated by her multiple disclosures to third parties, along with other evidence). The jury accredited the testimony of the State's witnesses and resolved any inconsistencies in favor of the State, as was its prerogative. *See Bland*, 958 S.W.2d at 659; *see also State v. Freels*, No. E2017-00951-CCA-R3-CD, 2018 WL 3414291, at *7 (Tenn. Crim. App. July 13, 2018) (holding that the evidence was sufficient to support the defendant's convictions for aggravated sexual battery and that, while the victim's forensic interview contained several inconsistent statements, the reconciliation of inconsistent testimony was for the jury to resolve). Accordingly, the Defendant is not entitled to relief.

## B.    Tennessee Code Annotated Section 24-7-123

The Defendant argues on appeal that he is entitled to plain error relief due to the trial court's "allowing" defense counsel to waive the statutory requirements of Tennessee Code Annotated section 24-7-123 for the admission of the victims' forensic interviews. Specifically, he argues the written stipulation agreed upon by the parties did not comply with the statutory requirements of Code section 24-7-123 because it did not contain "specific findings of fact," and the trial court erred by accepting this deficient stipulation. The State counters that the Defendant has failed to show he is entitled to relief under the plain error doctrine, reasoning that: (1) acceptance of the stipulation was not a breach of a clear and unequivocal rule of law, (2) the Defendant agreed to the recordings' admission for tactical reasons, (3) no substantial right of the Defendant's was adversely affected, and (4) consideration of the issue is not necessary to do substantial justice.

Tennessee Code Annotated section 24-7-123 provides the statutory requirements for the admission of a video recording of a forensic interview of a child under the age of thirteen wherein the child describes any act of sexual contact performed with or on the child by another. *See* Tenn. Code Ann. § 24-7-123(a) (2017). The interview "may be

considered for its bearing on any matter to which it is relevant in evidence at the trial" of the defendant. *Id.* The trial court "shall make specific findings of fact, on the record, as to the basis for its ruling under this section." *Id.* § -123(d).

Pursuant to this statute, the trial court may admit the video recording if "[t]he child testifies, under oath, that the offered video recording is a true and correct recording of the events contained in the video recording and the child is available for cross examination[.]" *Id.* § -123(b)(1). The video recording shall be "shown to the reasonable satisfaction of the court, in a hearing conducted pretrial, to possess particularized guarantees of trustworthiness." *Id.* § -123(b)(2). When determining whether the recording possesses such "particularized guarantees of trustworthiness," the trial court considers a number of factors, including: the child's mental and physical age and maturity; the child's motive to falsify or distort the event; the timing of the statement; the nature and duration of the alleged abuse; whether the child's young age makes it unlikely that the child fabricated a statement that represents a graphic, detailed account beyond the child's knowledge and experience; whether the statement was spontaneous or directly responsive to questions; whether the manner in which the interview was conducted was reliable, including, but not limited to, the absence of any leading questions; the existence of extrinsic evidence showing the defendant had the opportunity to commit the act complained of in the child's statement; the relationship of the child to the offender; whether the equipment that was used to make the video recording was capable of making an accurate recording; and any other factor deemed appropriate by the court. *Id.* § -123(b)(2)(A)-(K).

Next, the interview must be conducted by a forensic interviewer who meets specified professional qualifications at the time the recording was made. *Id.* § -123(b)(3). These qualifications include: employment by a child advocacy center that meets certain statutory requirements; graduation from an accredited college or university with a bachelor's degree in an enumerated field of study; experience equivalent to three years of fulltime professional work in certain areas; annual completion of forty hours of forensic training in interviewing traumatized children and fifteen hours of continuing education; completion of a minimum of eight hours of interviewing under the supervision of a qualified forensic interviewer of children; knowledge of child development through coursework, professional training, or experience; the lack of any criminal history as determined through a criminal records background check; and active participation in peer review. *Id.* § -123(b)(3)(A)-(H). Additionally, the interview must be both visual and oral, as well as recorded on certain audiovisual media. *Id.* § -123(b)(4). The recording should also include the entire unaltered interview and accurately reflect said interview. *Id.* § -123(b)(5). Finally, every voice heard on the recording should be properly identifiable. *Id.* § -123(b)(6).

In conducting plain error review, our court will reverse for plain error only if the five following prerequisites are satisfied:

(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)); *see also* Tenn. R. App. P. 36(b). All five factors must be present in the record before an appellate court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. *Smith*, 24 S.W.3d at 283. In order to warrant plain error relief, the magnitude of the error must have been so significant "that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)). Plain error relief should be "sparingly exercised[,]" *see State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007), and is only appropriate for errors that are "especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding," *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). A defendant has the burden of persuading the appellate court that plain error exists. *Bledsoe*, 226 S.W.3d at 355.

Here, the Defendant concedes that he has waived plenary review of this issue by failing to lodge a contemporaneous objection to admission of the victims' forensic interviews in the trial court. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). As such, he requests we review the issue for plain error. However, the Defendant did more than just fail to contemporaneously object to the admission of the victims' forensic interviews. Rather, prior to trial and after the State had filed a motion for a pretrial hearing on the matter, the Defendant, through his attorney, explicitly agreed that the forensic interview recordings met the statutory requirements of Code section 24-7-123 and signed the stipulation agreement to this effect. Typically, the decision regarding what evidentiary objections to raise, what arguments to pursue, and what agreements to conclude regarding the admission of evidence is the type of tactical trial decision that generally may be waived by trial counsel acting alone. *New York v. Hill*, 528 U.S. 110, 115 (2000). "[T]his court will not review an issue for plain error when the defendant has affirmatively

waived the issue rather than simply failed to object." *State v. Wyrick*, 62 S.W.3d 751, 768 (Tenn. Crim. App. 2001) (citing *Adkisson,* 899 S.W.2d at 641) (holding that the court will not determine plain error when the accused affirmatively "waived the issue for tactical reasons")). Moreover, "[i]t has long been settled in Tennessee that a party cannot take advantage of errors which he himself committed or invited, or induced the trial court to commit, or which were the natural consequence of his own neglect or misconduct." *State v. Garland*, 617 S.W.2d 176, 186 (Tenn. Crim. App. 1981) (collecting cases).

In addition to affirmatively waiving any such hearing and agreeing that the recordings met the statutory requirement of Code section 24-7-123, the Defendant used the victims' forensic interviews to argue to the jury that the element of penetration had not been proven. In this regard, he asserted that neither R.W. nor A.W. had reported that A.W.'s underwear was removed and, if such had happened, A.W. would have reported such a detail during her forensic interview. As such, even if we engaged in plain error review, the record belies the Defendant's assertion that no tactical reason existed for defense counsel to enter into the stipulation for admission of the victims' forensic interviews. *See State v. Cunningham*, No. M2024-00288-CCA-R3-CD, 2025 WL 2718858, at *26 (Tenn. Crim. App. Sep. 24, 2025) (holding that the defendant failed to show that he did not waive the playing of the victim's second forensic interview for tactical reasons when he attempted to use it in his defense strategy), *perm. app. denied* (Tenn. Mar. 30, 2026).

Additionally, in his brief, the Defendant notes that defense "counsel failed to demand compliance with" the statute. Yet, the Defendant failed to cite any authority, and we know of none, providing that a trial court commits plain error by accepting a stipulation from the parties, rather than making an independent assessment despite the stipulation, regarding whether a recording of a forensic interview meets the requirements of Code section 24-7-123. On the contrary, this court has previously observed that such stipulations are effective to support the admission of forensic interviews. *Cf. State v. Smith*, No. W2015-02360-CCA-R3-CD, 2017 WL 1959500, at *15 (Tenn. Crim. App. May 11, 2017) (noting approval for admission of a recording of the victim's forensic interview when, *inter alia*, the defendant stipulated that the forensic interviewer met the statutory requirements of Code section 24-7-123). Additionally, the Defendant failed to identify any requirements under the statute that were not met or rendered the recordings inadmissible. In so doing, he did not establish that the trial court breached a clear and unequivocal rule of law.

Importantly, for the purposes of waiver here, the Defendant is bound by defense counsel's action on his behalf. *Cf. House v. State*, 911 S.W.2d 705, 714 (Tenn. 1995) (holding that, in the post-conviction context, waiver is to be determined by an objective

standard under which a petitioner is bound by the actions or inactions of counsel). Absent a demonstration of ineffective assistance of counsel, the word from his attorney on such matters is the last. *See Cauthern v. State*, 145 S.W.3d 571, 600 (Tenn. Crim. App. 2004) (stating that courts generally defer to counsel's strategic and tactical decisions if they are informed decisions based on adequate preparation). Accordingly, the Defendant is not entitled to relief.[4]

## III. CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

s/ Kyle A. Hixson
KYLE A. HIXSON, JUDGE

---

[4] We note that in the plain error argument section of the Defendant's brief, he mentions relief under the cumulative error doctrine. While the Defendant makes no other argument to this point, *see* Tennessee Rule of Appellate Procedure 27(a)(7), we note that no single error in the judgments of the trial court was found, let alone multiple errors, entitling the Defendant to relief under this doctrine. *See State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010).